UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

JOHN F. DRISCOLL, as President of the Captains
Endowment Association, Inc., and the CAPTAINS
ENDOWMENT ASSOCIATION, INC.,

                                        Plaintiffs,

                    -against-

CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT, and RAYMOND W.
KELLY, as Commissioner of the New York City
Police Department,

                                        Defendants.

------------------------------------------------------------------- x

**NOTICE OF
CROSS-MOTION**

07 Civ. 10359 (GBD)(MHD)

 

**PLEASE TAKE NOTICE,** that upon the declaration of Alan M. Schlesinger,

dated December 7, 2007, and the exhibits annexed thereto, the declaration of Charles V.

Camipisi, dated November 7, 2007, and the exhibits annexed thereto, the declaration of Suzanne

Gimblet, dated November 6, 2007, defendants' memorandum of law in support of the motion to

dismiss, dated November 7, 2007, and all prior papers and proceedings had herein, Defendants

will move this Court, before the Honorable George B. Daniels, United States District Judge,

Southern District of New York, at the Courthouse thereof, 500 Pearl Street, New York, New

York, on a date and time convenient to the Court, for an order, pursuant to Rules 12(b)(6) of the

Federal Rules of Civil Procedure, dismissing the complaint in its entirety on the ground that the

complaint fails to state a claim upon which relief can be granted, in the alternative, for a

judgment, pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure, granting

summary judgment dismissing the complaint on the grounds that there is no genuine issue of

material fact, and for such other and further relief as the Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE,** that pursuant to Rule 12 of the Federal Rules of Civil Procedure, in the event that this motion is denied, in whole or in part, Defendants respectfully request 20 days from docketing of the order denying the motion to answer the amended complaint.

Dated:       New York, New York
             December 7, 2007

> **MICHAEL A. CARDOZO**
> Corporation Counsel of the
>    City of New York
> Attorney for Defendants
> 100 Church Street, Room 2-187
> New York, N.Y. 10007-2601
> (212) 788-0952

By:     _____
        Alan M. Schlesinger
        Assistant Corporation Counsel

To:   **GREENBERG BURZICHELLI GREENBERG P.C.**
      Attorneys for Plaintiffs
      9th Floor
      3000 Marcus Avenue, Suite 1 W7
      Lake Success, New York 11042

Schlesinger Decl.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

JOHN F. DRISCOLL, as President of the Captains
Endowment Association, Inc., and the CAPTAINS
ENDOWMENT ASSOCIATION, INC.,

**DECLARATION**

                                        Plaintiffs,

07 Civ. 10359 (GBD)(MHD)

                    -against-

CITY OF NEW YORK, the NEW YORK CITY
POLICE DEPARTMENT, and RAYMOND W.
KELLY, as Commissioner of the New York City
Police Department,

                                        Defendants.

-------------------------------------------------------------------- x

     **ALAN M. SCHLESINGER,** declares, under penalty of perjury and pursuant to

28 U.S.C. § 1746, that the following is true and correct:

     1.     I am an Assistant Corporation Counsel in the office of Michael A.

Cardozo, Corporation Counsel of the City of New York, attorney for defendants in the above-

referenced action. I submit this declaration in opposition to plaintiffs' motion for a preliminary

injunction prohibiting the enforcement of Interim Order 52 ("IO 52") and in support of

defendants' motion to dismiss, or in the alternative for summary judgment dismissing, the

complaint in this action. This declaration is based on the books and records of the City of New

York, and conversations with employees of the City.

     2.     There are two other cases challenging the constitutionality of IO 52 and

seeking to enjoin its implementation. Palladino v. City of New York, 07 Civ. 9246

(GBD)(MGD) and Lynch v. City of New York, 07 Civ. 9337 (GBD)(MGD). In each of those

cases defendants have opposed the preliminary injunction and moved to dismiss the complaint

or, in the alternative, for summary judgment dismissing the complaint.  In <u>Palladino</u> and <u>Lynch</u> police unions contend that IO 52 is an unconstitutional search.  In <u>Palladino</u> there is an additional claim, that IO 52 is void for vagueness.

3.      In each of those motions in <u>Palladino</u>, and in <u>Lynch</u>, declarations have been submitted from Charles V. Campisi, dated November 7, 2007, and the exhibits annexed thereto, and from Detective Suzanne Gimblet, dated November 6, 2007..

4.      As in <u>Palladino</u>, and <u>Lynch</u>, defendants now submit the following exhibits:

Exhibit 1      Declaration of Suzanne Gimblet, dated November 6, 2007; and

Exhibit 2      Declaration of Charles V. Campisi, dated November 7, 2007, and the exhibits annexed thereto.

These exhibits are admissible in evidence as sworn statements.

Dated:      New York, New York
December 7, 2007

**ALAN M. SCHLESINGER**

*Exhibit 1*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

MICHAEL J. PALLADINO, as President of the New
York City Detectives' Endowment Association, Inc.,
et al.

                                           Plaintiffs,

                 -against-

THE CITY OF NEW YORK, et al.,

                                Defendants.

------------------------------------------------------------------- x

**DECLARATION OF
SUZANNE GIMBLET**

07 Civ. 9246 (GBD)(MGD)

        **SUZANNE GIMBLET,** declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

        1.       I am a detective in the Police Department of the City of New York ("NYPD"). I was appointed to the Department on July 27, 1987, and I was assigned the rank of detective in November, 2001. I am an Alcohol and Substance Abuse counselor certified by the State of New York and I received my certification in 1997. To become certified involves classes, three years of work experience in a credentialed program and the passing of a written test. I have been in the NYPD's Counseling Unit for approximately 15 years.

        2.       I submit this declaration in opposition to plaintiffs' motion for a preliminary injunction prohibiting the enforcement of Interim Order 52 ("IO 52") and in support of defendants' motion to dismiss the complaint in this action. This declaration is based on my own personal knowledge and the books and records of the City of New York, and conversations with employees of the City.

        3.       The Counseling Unit interviews, evaluates, and advises NYPD personnel concerning possible alcohol abuse. Supervisors refer officers to the Counseling Unit for an

interview and evaluation.  In addition NYPD officers who believe that they may have a problem with alcohol may seek assistance on their own.

4.       An NYPD officer's use of the Counseling Unit is confidential, pursuant to federal law.

5.       Some of the NYPD employees that we interview are persons who have appeared at the Counseling Unit before while many are new cases who have never appeared at our unit before.

6.       In 2005 the Counseling Unit conducted 194 interviews of NYPD personnel, 105 of those employees were new to the Counseling Unit.

7.       In 2006 Counseling Unit conducted 238 interviews of NYPD officers, 135 of those employees were new to the Counseling Unit.

8.       In 2007, through September and into October, we conducted 171 interviews of NYPD personnel, and 135 of those employees were new to the Counseling Unit. Only 36 of the interviews conducted this year have been of employees known to the Counseling Unit.

9.       In total for the three years 2005-07, of a total of approximately 600 interviews conducted by the Counseling Unit, 380 were for officers who have not used the Counseling Unit's services before; that is they are new to our unit.

Dated:        New York, New York
              November  6    , 2007

                                        _Dct. Suzanne Gimblet_
                                        **SUZANNE GIMBLET**

*Exhibit 2*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

MICHAEL J. PALLADINO, as President of the New
York City Detectives' Endowment Association, Inc.,
et al.

                              Plaintiffs,

               -against-

THE CITY OF NEW YORK, et al.,

                         Defendants.

------------------------------------------------------------------ x

**DECLARATION OF
CHIEF CHARLES V. CAMPISI**

07 Civ. 9246 (GBD)(MGD)

        **CHARLES V. CAMPISI,** declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct

        1.      I am the Chief of the Internal Affairs Bureau ("IAB") of the Police Department of the City of New York ("NYPD") and I have been Chief of IAB for over 11 years. I have been a uniformed member of the NYPD since 1973   I submit this declaration in opposition to plaintiffs' motion for a preliminary injunction prohibiting the enforcement of Interim Order 52 ("IO 52") and in support of defendants' motion to dismiss the complaint or in the alternative for summary judgment.  A copy of IO 52 is annexed hereto as Exhibit "A."  This declaration is based on my own personal knowledge and the books and records of the City of New York, and conversations with employees of the City.

        2.      IAB is charged with, among other things, investigating possible corruption, criminality and serious misconduct among NYPD officers and civilians.  IAB is also responsible for suggesting improvements to the NYPD's governance of it officers.

**A.    The NYPD Overview**

3.    The NYPD has about 35,000 uniformed members of the service, that is NYPD officers in all ranks, from Police Officer to Chief.  All officers are empowered to make arrests.  Most NYPD Officers are required to carry handguns and are authorized to use that firearm, if that becomes necessary in the course of the officer's duties.

4.    Due to the responsibilities and powers invested in each NYPD officer, the NYPD closely regulates and monitors its officers.

**B.    Regulation of Police Officers And Fitness For Duty**

5.    Uniformed members of the police service are required to be fit for duty 24 hours per day.  Patrol Guide ("PG") 203-04, entitled "Fitness for Duty," which is annexed hereto as Exhibit "B."

6.    PG 203-04 provides that an officer must

1.    Be fit for duty at all times except when on sick report

2.    Do not consume intoxicants to the extent that member becomes unfit for duty.

Id.

7.    The NYPD issued IO 9 on May 17, 2002, which is entitled "Department Policy Statement Concerning The Operation Of a Motor Vehicle While Under The Influence of Alcohol."  A copy of IO 9, and IO 9-3 entitled "Conducting Ordered Breath Testing Of Uniformed Members Of The Service For The Presence Of Alcohol" both of which are annexed hereto as Exhibit "C."

- 2 -

8.      IO 9 refers to the requirement in PG 203-04 that NYPD officers not consume alcohol to the extent that they are unfit for duty and further provides that consistent with that regulation:

> any uniformed member of the service who causes physical injury to another person while operating a motor vehicle and is determined to be unfit for duty due to the consumption of alcohol will be terminated from the New York City Police Department, absent exigent circumstances.

Id.

9.      IO 9 also provides that any NYPD officer who is found to be driving while unfit for duty due to alcohol consumption will, at the least, be placed on dismissal probation, which means that the officer can be terminated during the probationary period without a hearing or further process.  Id.

10.     The officer placed on dismissal probation will be subject to breathalyzer testing while on duty.  Under the procedures for an NYPD officer in this position, a breathalyzer test above .02 is cause for a further, more sensitive test, on an "Intoxilyzer."  If the officer tests above .04 there will be a presumption that the officer is unfit for duty.  Id.; IO 9-3, which is also annexed as part of Exhibit "C."

11.     IO 9 also provides information for the officer who may be experiencing trouble with alcohol including confidential assistance units, including the Counseling Service Unit, emphasizing the Counseling Unit's confidentiality.  The NYPD's goal is stated in IO 9 as

> early detection and referral of personnel for evaluation and treatment *before* drinking causes problems in work performance or worse.

Id. (emphasis in original).

- 3 -

12.     In the event that a NYPD officer believes that he or she may be in a position where alcohol may be consumed while off-duty, the officer is required to take precautions to ensure that the officer does not become intoxicated while in possession of a firearm.

13.     The officer can, for example, choose to place his or her firearm in a safety box which is locked to protect against misuse of the officer's firearm while off duty.

14.     Officers are also subject to drug tests at a variety of times in the officer's career. First, the officer will be drug tested on entering into NYPD service as a probationary police officer. The officer will also be tested at the end of his or her probationary period.

15.     An officer may also apply for various specialty assignments, such as an assignment in the NYPD's Organized Crime Control Bureau ("OCCB"). As part of the screening for OCCB the officer will be administered a drug test.

16.     Drug tests may also be administered if there is reasonable suspicion that the officer has ingested a controlled substance. PG 205-30, entitled "Administration of Drug Screening Tests For Cause," which is annexed hereto as Exhibit "D."

17.     In addition, all NYPD officers, of all ranks, are subject to random drug testing. NYPD officers are selected at random and without reasonable suspicion to provide samples for analysis for controlled substances. A copy of PG 205-29, entitled "Random Drug Screening" is annexed hereto as Exhibit "E."

18.     Drug testing has a variety of goals. It protects the public from officers who may not be completely in control of themselves due to the use of controlled substances. Drug testing also protects the lives of fellow NYPD officers who rely on each other in life threatening situations which can arise suddenly, without warning, and which may require good

- 4 -

judgment under the most difficult of conditions.  Drug testing also reinforces the public's confidence in their Police Department and the public's willingness to cooperate fully with that police department.  That confidence and cooperation are essential to the mission of the NYPD.

19.    The NYPD has long recognized that some NYPD officers may have problems with alcohol consumption.  The NYPD maintains a Counseling Unit, which is concerned with possible alcohol abuse and officers may attend the Counseling Unit anonymously, that is, without telling any member of the NYPD.

20.    NYPD officers may also be directed to the Counseling Unit for an interview under certain circumstances.

21.    Unfortunately, the NYPD has also experienced a problem with officers being arrested for Driving While Intoxicated ("DWI").  In 2005, 10 off duty officers were arrested for alleged DWI.  In 2006, 16 off duty officers were arrested for DWI.  This year, to date, 12 NYPD off duty officers were arrested for alleged DWI.

22.    Tragically, the NYPD has also experienced the suicide of a number of officers.  From 2005-07 there were 10 suicides.  With respect to 4 of those 10 suicides there was either alcohol present at the scene or a medical examiner's report found alcohol in the body of the deceased officer.

23.    These statistics show that there are NYPD officers with alcohol problems that have resulted in illegal or life threatening behaviors.  The risk to the public and to fellow officers from an NYPD officer who has an alcohol problem that is not under control is real and the NYPD has responded to that very real risk.  These responses have included the use of the Counseling Service, described above, the requirement that officers be fit for duty at all times, and

a requirement that the firearms of a NYPD officer who is intoxicated be removed. <u>See</u> PG-204-08 which is annexed hereto as Exhibit "F."

24.      The NYPD requires that firearms be removed from any member of the service that is intoxicated, either on or off duty. The removal prevents the officer from injuring him or herself or another and is preventive. <u>See</u> PG 206-12, ¶ 6, entitled "Removal of Firearms From Intoxicated Uniformed Member of the Service," which is annexed hereto as Exhibit "G."

**C.      Firearms Discharges By NYPD Officers**

25.      According to NYPD records, in 2004 there were 111 occasions on which an NYPD officer discharged his or her firearm, other than on the range. This figure includes on and off duty firings and incidents in which no one was injured and no property damaged. In 2005, the number of firearms discharges was 130, in 2006, the number was 119, and this year to date, 104 firearms discharges have occurred. While every firearm discharge that is not on the range is a very serious occurrence, it should be noted that the number of firearms discharges is relatively small considering the size and activity of the NYPD.

26.      Every discharge of a firearm by a NYPD officer, whether on or off duty, that is not on a firearms range, is investigated under a firearms discharge procedure found in the Patrol Guide. <u>See</u> a copy of PG 212-29, entitled "Firearms Discharge By Uniformed Members Of The Service," a copy of which is annexed hereto as Exhibit "H," and PG 212-53, entitled "Command Responsibilities When A Person Dies Or Sustains A Serious Injury In Connection With Police Activity," which is annexed hereto as Exhibit "I."

27.      Following the discharge of a firearm, a variety of superior officers and investigators will respond to the scene of the shooting, regardless of whether the shooting is on or off duty and regardless of whether an injury has resulted from the shooting. Those responding

will almost always include the Patrol Borough's "Shooting Team Leader" who is a Captain or above and who leads the initial investigation of any shooting. Id.

28.     Included among these will be a ranking IAB officer. A superior office from the Patrol Borough in the command of occurrence will also respond, unless the incident occurs outside the City of New York.

29.     A Chief or an Inspector who is on duty specifically to supervise such investigations, called the Duty Inspector or the Duty Chief, will respond to the scene and supervise the investigation into the firearms discharge.

30.     The office of the District Attorney for the area in which the shooting occurred will be notified and that office may decide to have personnel respond to the shooting. PG 212-29, ¶ 8.

31.     A community affairs officer will also respond to the scene of the shooting to determine whether the shooting will require extensive dialogue with the community to explain the actions of the NYPD's officer and to gauge community reaction at the time of the firearms discharge.

32.     The NYPD also maintains a Trauma Counseling Program and that program can offer counseling to the officer or officers who are involved in a firearms discharge and who may, for example, be traumatized by the experience. The officer may also use, or be sent to, the NYPD's Psychological Services Division for evaluation. PG 212-29, ¶ 18(b) and 19.

33.     In addition, all shootings are treated as part of a possible criminal investigation in recognition of the fact that criminal charges may result against the NYPD officer or a civilian involved in the shooting incident. Of course, whether criminal charges against anyone will result cannot be determined until the investigation is completed and that is why the

NYPD treats all firearms discharges as an investigation into a possibly criminal matter. Therefore, the Crime Scene Unit often responds to the scene of a shooting. PG 212-53, which is annexed hereto as Exhibit "I."

34.     All shooting investigations include an initial report prepared by the Shooting Team Leader. Later, there will be a final report completed by a commanding officer, a review by a Borough Firearms Discharge Advisory Board and a final review by the Chief of Department's Firearms Discharge Review Board. A copy of a sample of such a report is annexed hereto as Exhibit "J."

35.     The Shooting Team Leader will investigate and prepare an initial report concerning the discharge. The initial report will contain a narrative of the shooting based on the information obtained in their preliminary investigation

36.     The officer or officers who fired their weapons will have those weapons examined and inspected. For example, the number of live and spent shells will be recorded. The ammunition possessed by the officer will be taken for safekeeping.

37.     The initial report may also contain a preliminary evaluation, if possible, of whether the discharge was within NYPD guidelines. The report may also include a recommendation of whether corrective action or disciplinary proceedings should be initiated. See PG 212-29.

38.     The initial report on the shooting will provide information concerning any arrests made, of civilians or of members of the NYPD, and will record the activities of the Crime Scene Unit, which often recovers and takes custody over physical evidence found at the scene such as spent shell casings and any weapon found that is not from the NYPD officer or officers. The Crime Scene Unit may also take photographs to record the physical layout of the scene.

39.     The Commanding Officer of the Borough Investigation Unit or the precinct of occurrence prepares a follow up report within 90 days of the shooting, or as soon thereafter as possible.   This report includes findings and recommendations, the Medical Examiner's report (if applicable), the ballistics report, a synopsis of the police officer's statements, and, if applicable, District Attorney or grand jury findings as well as IAB findings. Id.

40.     A Borough Firearms Discharge Advisory Board reviews the incident and can sustain or alter findings and recommendations that were made earlier in the investigation. The Borough Firearms Discharge Advisory Board usually has approximately 7 members including one officer who is of the same rank as the officer who discharged his or her firearm. The remaining 6 members will be at or above the rank of Captain and will include the Commander of the Patrol Borough.  Id.

41.     The Borough Firearms Discharge Advisory Board prepares a report to the Chief of Department's Firearms Discharge Review Board that includes findings and recommendations.

42.     The NYPD's Firearms Discharge Review Board is chaired by the Chief of Department and includes the Deputy Commissioner for Training, the Deputy Commissioner for Legal Matters, Chief of Personnel, an Operational Bureau Chief and the Commanding Officer of the Firearms and Tactics Section.  Id.

43.     The officer who discharges his firearm, whether on duty or off duty and regardless of whether the shooting is justified or not, will attend a tactics review session conducted by the NYPD.  PG 212-29, at p. 8 of 9.

44.     The Police Department follows the policy outlined above in all instances where a member of the service discharges his or her firearm, whether on or off duty and whether or not there has been an injury to a person resulting from the discharge.

45.     From this brief overview of the procedure for investigating a firearms discharge, regardless of whether the discharge is on or off duty and regardless of whether there is an injury, it can readily be seen that the NYPD takes firearms discharges by NYPD officers with the utmost seriousness. The NYPD goes to great lengths to investigate the discharge, treat the scene as a crime scene to ensure prosecutions, and to assure the public and the NYPD's own officers that the truth of the shooting will be brought out and appropriate actions taken.

46.     Appropriate action may be additional training of one or more officers. Appropriate action may also include disciplinary action against the officer or, in relatively rare circumstances, a criminal case.

**D.     The November 26, 2006, Shooting**

47.     On November 26, 2006, an undercover operation at a club in Queens, New York, conducted by the NYPD's OCCB, ended in the shooting death of Sean Bell and the wounding of two companions as the result of shots fired by NYPD officers. Three of the NYPD officers were indicted by a grand jury with respect to the November 26, 2006, incident and they await a criminal trial.

48.     Following the incident, a number of questions were raised by elected officials, the media and community leaders about various aspects of NYPD undercover operations.

49.     It is into this most highly regulated environment that IO 52 has introduced breathalyzer test for all NYPD officer involved in a shooting which has caused injury or death to a person.

E.    IO 52

50.    In the wake of the tragic shooting death of Sean Bell and the wounding of two companions in November, 2006, the Police Commissioner convened a committee to review undercover operations procedures and make recommendations for improvements.

51.    I chaired the committee which included the Chief of OCCB, the Deputy Commissioner of Intelligence, the Deputy Commissioner for Training, the Deputy Commissioner for Strategic Initiatives, the Deputy Commissioner for Legal Matters, the Chief of Personnel, and the Chief of Community Affairs.  The committee also included Dr. Cedric L. Alexander who is not a member of the NYPD and who was, at the time, the Deputy Commissioner of the New York State Division of Criminal Justice.  Dr. Alexander is a former Chief of the Rochester, New York, Police Department, and is currently the Chief of Security for the Transportation Safety Administration in the Dallas/Fort Worth Airport.

52.    On June 18, 2007, the Police Commissioner announced 19 recommendations made by the Committee for Review of Undercover Procedures.  The special panel made recommendations to improve how undercover officers are recruited, trained, supervised, and retained.  In addition, the special panel recommended mandatory breathalyzer tests of all NYPD officers, on duty and off duty, whose firearm discharge results in injury or death.  All 19 recommendations were disseminated to the public through a Police Department press release.  The recommendation were announced on June 18, 2007, prior to the completion of the committee's report.  The release of the recommendation preceded completion of the final report so that implementation of those recommendations would not be delayed.  A copy of the Press Release, dated June 18, 2007, is annexed hereto as Exhibit "K."

53.    The recommendations included a recommendation, number 10 of 19 recommendations, that NYPD officers be administered a breathalyzer test at the scene of a shooting which results in injury or death to a person.

54.    On September 30, 2007, the Police Commissioner issued IO 52 entitled Alcohol Testing For Uniformed Members of the Service Involved in Firearms Discharges Resulting In Injury To Or Death Of A Person." A copy of IO 52 is annexed hereto as Exhibit "A."

55.    The purpose of IO 52 is set forth in that regulation which states its "Purpose" as

> To ensure the highest levels of integrity at the scene of police involved firearms discharges which results in injury to or death of a person, or off duty, within New York City.

IO 52 ¶ "2," "Purpose."

56.    IO 52 is only applied if

- there is a shooting;

- in New York City;

- by a uniformed member of the NYPD;

- resulting in injury or death;

- to a person.

57.    IO 52 is in addition to, not in place of, the investigation of firearms discharges described above and in PG 212-29.

58.    The procedures of IO 52 are applicable even when there is little or no risk of criminal prosecution as long as there has been a shooting by an NYPD officer in New York City that has injured a person. For example, where an officer accidentally discharges the

officer's weapon injuring the officer there is generally very little risk of criminal prosecution and yet IO 52 is to be followed in that situation. This situation is far from hypothetical. Indeed, there has been such an accidental discharge since IO 52 became effective and a breathalyzer was taken of that officer (who was not intoxicated).

59.     It is my understanding that a breathalyzer test will not detect alcohol as of the shooting unless it is administered very soon after the shooting event. The information will be lost if not collected and preserved quickly. Therefore IO 52 requires that the breathalyzer test be administered at the scene in a way that maximizes the privacy of the officer to whom the test is administered.

60.     The NYPD has experience in administering breathalyzer tests, especially in the NYPD's Highway Patrol Unit which administers breathalyzers to civilians who are suspected of driving while intoxicated.

61.     Procedures in IO 52 will take advantage of this expertise to ensure that the breathalyzer is administered properly so that the results are reliable. The breathalyzer test itself takes about 5 minutes to perform.

62.     Under the New York State Vehicle and Traffic Law ("VTL") an individual cannot drive while under the influence of alcohol and a score of .08 on a breathalyzer test indicates that the driver is under the influence. IO 52 incorporates the standard applied by the VTL.

63.     If the officer scores less than a .08 no further testing is done. IO 52, ¶ "12."

64.     If the officer scores a .08 or greater on the breathalyzer then further testing will be done to determine whether the officer is intoxicated. Id.

- 13 -

65.    The officer scoring greater than .08 will be tested on an Intoxilyzer by the Highway Patrol District's Intoxicated Driver Testing Unit ("IDTU") which has experience in administering that test. The Intoxilyzer is a more sensitive testing instrument for the assessment of alcohol consumption.

66.    The results of the alcohol testing may result in discipline of the officer who has been involved in a shooting while under the influence of alcohol. The results may also be used in the criminal investigation of the shooting.

67.    IO 52 also notes that "Members should be aware that it would be prudent not to ingest alcoholic beverages up to four (4) hours prior to the commencement of their tour of duty." IO 52 at p. 3 of 4.

68.    The NYPD has recognized that some NYPD officers may be experiencing problems with alcohol. Those problems may manifest themselves in being unfit for duty, either on duty or off duty. The alcohol problem may also manifest itself in a more extreme manner like a DWI arrest or, tragically as a possible factor in the suicide of an officer. The NYPD recognizes its obligation to the public and to fellow NYPD officers by requiring fitness for duty and the removal of weapons of an intoxicated officer. The NYPD also recognizes its duty to the officer by providing counseling services on a confidential basis and encouraging the use of those services.

69.    The NYPD also recognizes that public confidence in the NYPD is critical to the accomplishment of the NYPD's mission of preserving and protecting the health, safety and welfare of the public. The possibility that a NYPD officer might be involved in a shooting while under the influence of alcohol undermines that trust and risks the integrity of the NYPD.

70.     IO 52 serves the NYPD's interests in

- protecting the integrity of the NYPD,

- protecting the safety of the public and NYPD officers,

- deterring alcohol intoxication by NYPD officers who are carrying firearms,

- assuring the public that one of the most important and daunting powers of the police, the power to apply deadly force when necessary, is not being abused or used by officers who are under the influence of alcohol.

Any use of the results of the testing in criminal cases will be an added effect of the testing's primary purpose of ensuring that NYPD officers entrusted with the immense power of carrying and using a firearm do not misuse that authority.

For all of the above reasons, defendants respectfully request that plaintiffs' motion for a preliminary injunction prohibiting the continued enforcement of IO 52 be denied and that the complaint be dismissed.

Dated:      New York, New York
            November ____7____, 2007

                                        _signature_

                                        **CHARLES V. CAMPISI**

Exhibit A



# INTERIM ORDER

| SUBJECT: | ALCOHOL TESTING FOR UNIFORMED MEMBERS OF THE SERVICE INVOLVED IN FIREARMS DISCHARGES RESULTING IN INJURY TO OR DEATH OF A PERSON | |
|---|---|---|
| DATE ISSUED: | REFERENCE: | NUMBER: |
| 09-30-07 | **P.G. 212 SERIES | 52 |

1.      In an effort to ensure the highest levels of integrity at the scene of firearms discharges, all uniformed members of the service involved in firearms discharges, which result in injury to or death of a person, will be subject to Department administered alcohol testing.

2.      Accordingly, when a uniformed member of the service, on or off duty, is involved in a firearms discharge within New York City which results in injury to or death of a person, the following procedure will be complied with:

**PURPOSE**            To ensure the highest levels of integrity at the scene of police involved firearms discharges which result in injury to or death of a person, on or off duty, within New York City.

**PROCEDURE**       When involved in, or responding to the scene of a police involved firearms discharge which results in injury to or death of a person, on or off duty, within New York City:

**UNIFORMED**       1.    Request immediate response of patrol supervisor.
**MEMBER OF**        2.    Comply with the provisions of *P.G. 212-29, "Firearms Discharge by*
**THE SERVICE**            *Uniformed Members of the Service."*

**PATROL**                3.    Notify Operations Unit of shooting, immediately, and request response of
**SUPERVISOR**            Internal Affairs Duty Captain, Internal Affairs personnel and the Patrol
                                   Services Bureau Duty Inspector and Duty Captain.

**DUTY**                   4.    Inform uniformed member(s) of the service who discharged their
**CAPTAIN/**                  firearm that they will be subject to alcohol testing.
**INSPECTOR**         5.    Ensure involved member(s) of the service remain on the scene when
                                   feasible and consistent with safety (i.e., hospitalization not immediately
                                   required); pending arrival of Internal Affairs Bureau personnel assigned
                                   to administer alcohol test.
                              6.    Notify IAB Command Center of location of involved member(s) of the
                                   service if they are removed from location of firearms discharge.

**IAB**                    7.    Notify assigned IAB personnel and the IAB Duty Captain of any
**COMMAND**                pertinent information including any change of location of involved
**CENTER**                  member(s) of the service.

| | | |
|---|---|---|
| **INTERNAL** | 8. | Respond to location and confer with Duty Captain/Inspector on scene. |
| **AFFAIRS** | 9. | Advise the subject member that he or she may be tested by a number of |
| **BUREAU DUTY** | | different means, such as the PBT device and the Intoxilyzer. |
| **CAPTAIN** | 10. | Conduct alcohol test, using a PBT (portable breathalyzer test) device in a private setting, on uniformed member(s) of the service who discharged a firearm. |

    a. Conduct the testing process in a private setting (e.g., Nearest Department facility, Department auto being used by the supervisor concerned) in a dignified, respectful fashion.

11. If the reading on the PBT device is less than .08, no further testing is required at this time.

12. If the reading on the PBT device is .08 or greater, which according to Section 1192 of the Vehicle and Traffic Law of the State of New York is indicative of intoxication, immediately notify Highway I.D.T.U. to respond to the IAB testing location to test the subject member using the Intoxilyzer that is maintained at the IAB facility. (It should be emphasized that the Intoxilyzer test at the IAB facility will be conducted by an I.D.T.U. technician.)

    a. Member(s) involved will be transported to the IAB testing facility by IAB personnel.

    b. A Highway District supervisor must be present during all phases of the testing procedure.

13. In the event that alternate arrangements must be made, the Intoxilyzer test will be conducted at the closest I.D.T.U. facility.

    a. Member(s) involved will be transported to the I.D.T.U. testing facility by I.A.B. personnel.

    b. A Highway District supervisor must be present during all phases of the testing procedure.

**NOTE**     *The I.D.T.U technician will utilize a specially developed form entitled **Ordered Breath Test Instruction Sheet** to interview the subject member(s), and a specially developed checklist entitled **Intoxilyzer Operational Checklist** to conduct the test. The entire Intoxilyzer testing process, including the reading of the test results, will be videotaped by another member of the Highway District. In cases where there is an Intoxilyzer reading of .08 or greater, a copy of the videotape will be provided to the I.A.B. Duty Captain concerned, who will follow all applicable Departmental procedures to safeguard the tape for evidentiary purposes.*

| | | |
|---|---|---|
| **INTERNAL** | 14. | In order to determine fitness for duty, record and then take into account the |
| **AFFAIRS** | | Intoxilyzer reading, the PBT reading, and any other related indicia of intoxication, |
| **BUREAU DUTY** | | as indicated in Appendix "A". |
| **CAPTAIN** | | |

    a. If the member is apparently unfit for duty, be guided by the procedures contained in *P.G. 206-12, "Removal of Firearms from Intoxicated Uniformed Member of the Service"* and other appropriate Department procedures.

**NOTE**     *If the subject member is determined to be unfit for duty, the IAB Command Center will be notified at (212) 741-8401 and a log number will be obtained.*

**INTERIM ORDER NO. 52**

| | |
|---|---|
| ***ADDITIONAL DATA*** | *Members of the service are reminded of the contents of Patrol Guide procedures 203-04, "Fitness For Duty" and 204-08, "Firearms – General Regulations" as they relate to the use of alcohol and the possession of firearms while off duty.* |
| | *Members should be aware that it would be prudent not to ingest alcoholic beverages up to four (4) hours prior to the commencement of their tour of duty.* |
| ***RELATED PROCEDURES*** | *Firearms Discharge by Uniformed Members of the Service (P.G. 212-29)*<br>*Removal of Firearms from Intoxicated Uniformed Member of the Service (P.G. 206-12)* |

3.    Any provisions of the Department Manual or any other Department directive in conflict with the contents of this order are suspended.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All Commands**

**INTERIM ORDER NO. 52**

## APPENDIX "A"

### INDICIA OF INTOXICATION

Face to face observation and interaction with the subject member allows the supervisor concerned to use his or her senses to obtain "evidence" of alcohol intoxication:

* The sense of sight
* The sense of hearing
* The sense of smell

### SIGHT

* Bloodshot eyes
* Flushed face
* Soiled, mussed, disarrayed clothing
* Fumbling (e.g., dropping paperwork, keys etc.)
* The presence of alcohol containers
* Physical coordination (e.g., swaying, staggering, unsteady, falling, wobbling, sagging knees, using a wall or furniture as a prop)
* Unusual actions (e.g., hiccupping, belching, vomiting, fighting, sleepy, urinating)

### HEARING

* Slurred speech
* Admission of drinking
* Inconsistent responses
* Incoherent
* Abusive language, profanity
* Antagonistic
* Unusual statements

### SMELL

* Odor of alcohol on breath
* "Cover Up" odors (e.g., breath spray, mints)
* Open alcoholic beverages
* Unusual odors

***NOTE***:          These traits are illustrative; this is not meant to be a complete list of indicia.

**INTERIM ORDER NO. 52**

Exhibit B

# PATROL GUIDE



| Section: General Regulations | Procedure No: 203-04 |
|---|---|

| **FITNESS FOR DUTY** |
|---|

| DATE ISSUED:<br>07/21/00 | DATE EFFECTIVE:<br>07/28/00 | REVISION NUMBER:<br>00-03 | PAGE:<br>1 of 1 |
|---|---|---|---|

**FITNESS FOR DUTY**

1.  Be fit for duty at all times, except when on sick report.
2.  Do not consume intoxicants to the extent that member becomes unfit for duty.

**ADDITIONAL DATA**

Members of the service **SHOULD NOT** be in possession of their firearms if there is any possibility that they may become unfit for duty due to the consumption of intoxicants.

Any misconduct involving a member's misuse of a firearm while unfit for duty due to excessive consumption of, and intoxication from, alcohol will result in that member's termination from the Department. Exceptional cases will be determined by the Police Commissioner, on a case by case basis.

Furthermore, any misconduct involving members who are found to be unfit for duty due to excessive consumption and intoxication from alcohol, while armed with a firearm, will result in the inclusion of the charge of "Unfit For Duty While Armed," in Departmental disciplinary proceedings. In addition to those penalties imposed as a result of all other charges stemming from the misconduct, strict punitive sanctions will be imposed for any member upon whom the charge has been substantiated.

Additionally, a uniformed member of the service who refuses to submit to chemical testing in connection with an alleged violation of section 1192 of the New York State Vehicle and Traffic Law (Driving While Intoxicated) will be charged with violating Patrol Guide procedure 203-10, page 1, step 4, "Engaging in conduct prejudicial to the good order, efficiency, or discipline of the Department."

Members of the service are also reminded of the Department's commitment to the many counseling and assistance programs available for a wide variety of problems. Members who are experiencing problems related to alcohol, or know of any other member who may be experiencing problems related to alcohol, are strongly encouraged to call HELPLINE at (718) 271-7777, in order to achieve confidential assistance.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# DEPARTMENT MANUAL REVISION NOTICE

| GUIDE: | NUMBER: | DATE ISSUED: | DATE EFFECTIVE: |
|--------|---------|--------------|-----------------|
| **PATROL** | **01-03** | **11/30/01** | **12/07/01** |

1. Interim Order 38, series 2000 introduced the use of a Complaint Re-Classification Log to ensure proper and timely documentation of the **COMPLAINT FOLLOW-UP (PD313-081)**. Therefore, add the following new pages to existing Patrol Guide procedure 207-09, "Follow-Up Investigations of Complaints Already Recorded."

   - 207-09, pages 3 and 4
   - Interim Order 38, series 2000 is **REVOKED**

   **Ink Change**: Renumber P.G. 207-09, pages 1 and 2 to read 1 of 4 and 2 of 4.

2. Patrol Guide procedure 209-29, "Seizure of Unlicensed Tow Trucks," has been revised due to numerous procedural changes which clarify the circumstances under which an unlicensed tow truck may be seized and impounded. Therefore, replace the existing procedure with the revised attached procedure.

   - 209-29, pages 1 through 8
   - Interim Order 41, series 2000 is **REVOKED**

3. Patrol Guide procedure 210-07, "Prisoners - Unusual Occurrence," has been revised due to changes in the notification process for the New York State Commission of Correction. Therefore, replace the existing procedure with the revised attached procedure.

   - 210-07, pages 1 and 2
   - Interim Order 17, current series is **REVOKED**

4. Spofford Juvenile Center has changed its name to the Bridges Juvenile Center, located at 1221 Spofford Avenue, Bronx, N.Y. Additionally, the Vernon C. Bain Center no longer provides lodging for juvenile delinquents (male or female) who are not eligible for personal recognizance. All intake processing will take place at the Bridges Juvenile Center. Therefore, replace the existing procedure pages with the revised attached pages.

   - 215-09, pages 3 and 4 FINEST Message 013363, dated 12/29/99 is **REVOKED**

   **Ink Changes:**

   a. **Revise** Patrol Guide Procedure 208-42, "Arrest on a Warrant," "ADDITIONAL DATA" statement page <u>3</u>, second paragraph, Juvenile Center, Spofford House, and page <u>4</u>, subdivision <u>b</u>, Spofford Juvenile Center, to read:

      "Bridges Juvenile Center."

   b. **Revise** Patrol Guide Procedure 215-09, "Offense Committed by a Child Under 16 Years of Age (Other than a Juvenile Offender)," "Note" following step <u>6</u>, page <u>1</u>, Spofford Juvenile Center and step <u>20</u>, page <u>2</u>, Spofford Juvenile Center, to read:

      "Bridges Juvenile Center."

# NEW • YORK • CITY • POLICE • DEPARTMENT

# DEPARTMENT MANUAL REVISION NOTICE

| GUIDE: | NUMBER: | DATE ISSUED: | DATE EFFECTIVE: |
|---|---|---|---|
| **PATROL** | **01-03** | **11/30/01** | **12/07/01** |

5.  Patrol Guide procedure 216-01, "Aided Cases General Procedure" has been amended to include Lifenet as an additional referral program for counseling assistance outside the purview of this Department. Therefore, replace the existing procedure pages with the revised attached pages.

- 216-01, pages 3 and 4
- Interim Order 44, series 2000 is **REVOKED**

6.  Interim Order 30, series 2000, established a new procedure for court-ordered "assisted outpatient treatment" of persons found to require treatment for mental illness, and who have a history of non-compliance with psychiatric treatment. Therefore, insert new Patrol Guide procedure 216-17, "Involuntary Removals Pursuant to Mental Hygiene Law Section 9.60" in proper numerical order.

- 216-17, pages 1 through 6
- Interim Order 30, series 2000 is **REVOKED**

7.  **Ink Changes**: Patrol Guide procedure 203-03, "Compliance with Orders," is being amended to reflect the required posting of the new Gun Safety Sticker that highlights safety precautions when loading and unloading firearms.

- Interim Order 23, current series is **REVOKED**

    a.    **ADD** to P.G. 203-03 new step "<u>8</u>", page "<u>1</u>", opposite caption "COMPLIANCE WITH ORDERS" to read:

    "<u>8</u>.    <u>Affix Gun Safety Sticker (SP414) to assigned locker and at all Department firearms safety stations</u>"

    b.    **RENUMBER** current step "<u>8</u>", to read: "<u>9</u>."

8.  **Ink Changes**: Patrol Guide procedures 203-04, "Fitness for Duty," and 204-08, "Firearms – General Regulations," have been amended to clarify Departmental policy regarding the responsibility for uniformed members of the service to be fit for duty while armed.

- Interim Order 7, current series is **REVOKED**

    a.    **REVISE** P.G. 203-04 first paragraph opposite "ADDITIONAL DATA" statement on page "<u>1</u>", to read:

    *"ADDITIONAL DATA*    *All members of the service are required to remain fit for duty as specified above, and are reminded of their absolute responsibility to remain fit for duty while in possession of their firearms."*

    b.    **REVISE** P.G. 204-08 step "<u>2</u>" subdivision "<u>e</u>", opposite "EQUIPMENT FIREARMS," on page "<u>1</u>", to read:

    "<u>e</u>.    <u>There is a likelihood that member will be consuming alcoholic intoxicants.</u>"

## NEW • YORK • CITY • POLICE • DEPARTMENT

# DEPARTMENT MANUAL REVISION NOTICE

| GUIDE: | NUMBER: | DATE ISSUED: | DATE EFFECTIVE: |
|---|---|---|---|
| **PATROL** | **01-03** | **11/30/01** | **12/07/01** |

9.    **Ink Changes**: Patrol Guide procedure 207-08, "Preliminary Investigation of Vice, Narcotics or Organized Crime – Related Complaints," is being amended to ensure coordination of investigations involving child pornography.

      a.    **REVISE** the definition of "VICE OFFENSES" on page <u>1</u> to read:

          "VICE OFFENSES - Violations of law related to gambling, prostitution, alcoholic beverages, cigarette tax and child pornography."

      b.    **ADD** the following paragraph to "ADDITIONAL DATA," page <u>4</u>, to read:

          ***"CHILD PORNOGRAPHY***

          *A complaint involving child pornography (photos, movies, computer images, etc.) will be referred to the Vice Enforcement Division's Sexual Exploitation of Children Squad for investigation. The Vice Enforcement Division will also investigate complaints involving other forms of sexual exploitation of children, including minors employed by peep shows, topless clubs, lap dancing clubs or escort services. Additionally, a telephone notification will be made to the Vice Enforcement Division when child pornography is found or an arrest is made for any violation of Penal Law Article 263."*

10.   **Ink Changes**: Patrol Guide procedure 207-31, "Processing Civilian Complaints," has been amended to include a follow-up notification to the Internal Affairs Bureau Command Center.

      a.    **ADD** new "NOTE," following step "4", page "3", to read:

          *"NOTE*      *A follow-up notification to the Internal Affairs Bureau Command Center at (212) 741-8401, will also be made to obtain an Internal Affairs Bureau log number. Indicate that number on the top of the **CIVILIAN COMPLAINT REPORT**, under the caption I.A.B. LOG #."*

- Interim Order 29, current series is **REVOKED**

11.   **Ink Changes**: Patrol Guide procedure 217-01, "Vehicle Accidents – General Procedure," has been amended to include a new Post Office Box for Police Accident Reports forwarded by this Department. The Mail and Distribution Unit will continue to forward these Reports to the Department of Motor Vehicles.

      a.    **ADD** subdivision "a," to step "21", page "4", to read:

          *"a.    **Police Accident Reports** shall be placed in an envelope addressed to:*
             *New York State Department of Motor Vehicles*
             *Accident Records Bureau*
             *P.O. Box 2605*
             *Albany, New York 12220-0605"*

- Interim Order 30, current series is **REVOKED**

# NEW • YORK • CITY • POLICE • DEPARTMENT

## DEPARTMENT MANUAL REVISION NOTICE

| GUIDE: | NUMBER: | DATE ISSUED: | DATE EFFECTIVE: |
|---|---|---|---|
| **PATROL** | **01-03** | **11/30/01** | **12/07/01** |

12.   **Ink Changes**: With the advent of the Citywide Intelligence Reporting System (P.G. 212-12) the **INTELLIGENCE REPORT (PD378-151)** has been eliminated. Therefore, make changes in ink on the following existing procedure pages:

| **PROCEDURE** | **CHANGE** |
|---|---|
| P.G. 207-11 | **Delete** step <u>20</u>, page <u>4,</u> and **Renumber** steps <u>21</u> and <u>22</u> to read:  <u>20</u> and <u>21</u>.<br>**Delete INTELLIGENCE REPORT (PD378-151)** page <u>5,</u> "FORMS AND REPORTS." |
| P.G. 209-16 | **Delete INTELLIGENCE REPORT (PD378-151)** page <u>2,</u> "FORMS AND REPORTS." |
| P.G. 214-02 | **Delete INTELLIGENCE REPORTS (PD378-151)** step <u>8a</u>, page <u>1</u>.<br>**Delete INTELLIGENCE REPORT (PD378-151)** page <u>4,</u> "FORMS AND REPORTS." |
| P.G. 214-15 | **Delete INTELLIGENCE REPORT (PD378-151)** page <u>2,</u> "FORMS AND REPORTS." |

13.   **Patrol Guide Index Ink Change:**

200-04 page 13, under major caption **Mentally Ill or Emotionally Disturbed Persons** add new subcaption to read:

"Involuntary Removals Pursuant
to Mental Hygiene Law ……………… …...…………..216-17"

14.   The following Interim Orders have been incorporated into new procedures which were included in Patrol Guide Revision Notice 01-02, and are therefore **REVOKED**:

➢ Interim Order 32, series 1998, "New Department Form-Change of Emergency Notification (PD451-152)" incorporated into Patrol Guide Procedure 203-18, "Emergency Notification Procedure/Residence Requirements."

➢ Interim Order 56, series 1998, "Integrity Monitoring File," incorporated into Patrol Guide procedure 203-21, "Integrity Monitoring File."

➢ Interim Order 8, series 1999, " School Safety Agent-Victim of an Offense While Performing Duty," incorporated into Patrol Guide procedure 212-97, "School Safety Agent-Victim of an Offense While Performing Duty."

➢ Disregard any references to Administrative Guide procedures 319-35, 320-45, and 322-33 within Patrol Guide Revision Notice 01-02.

## NEW • YORK • CITY • POLICE • DEPARTMENT

Exhibit C



## INTERIM ORDER

| SUBJECT: | **DEPARTMENT POLICY STATEMENT CONCERNING THE OPERATION OF A MOTOR VEHICLE WHILE UNDER THE INFLUENCE OF ALCOHOL** |
|---|---|

| DATE ISSUED: | REFERENCE: | | NUMBER: |
|---|---|---|---|
| **05-17-02** | **PG 203-04** | | **9** |

1.     Patrol Guide procedure 203-4, "Fitness For Duty" mandates the following:

    a.     Be fit for duty at all times, except when on sick report.

    b.     Do not consume intoxicants to the extent that member becomes unfit for duty.

Consistent with the above, any uniformed member of the service who causes serious physical injury to another person while operating a motor vehicle and is determined to be unfit for duty due to the consumption of alcohol will be terminated from the New York City Police Department, absent exigent circumstances.

    2.     Additionally, any negotiated plea of a Department case involving a uniformed member of the service who is determined to have been operating a motor vehicle while unfit for duty due to the consumption of and/or intoxication from alcohol shall include a period of Dismissal Probation. Further, any such negotiation shall include the subject officer's agreement to submit to ordered breathalyzer testing while on duty during the period of probation. Should the member be found unfit for duty or refuse to submit to breathalyzer testing, this will result in additional disciplinary action against the subject officer which may include termination.

    3.     Members of the service whose alcohol consumption has caused problems for them or others are urged to self-report before they are responsible for a serious incident and the above disciplinary action becomes necessary. They can do so in complete confidence by calling the Counseling Service Unit at (718) 834-8433 or (800) 431-4666.  Additionally, members who are experiencing problems related to alcohol, are strongly encouraged to call *HELPLINE* at (718) 271-7777 or the Police Organization Providing Peer Assistance, (POPPA), at (1-888-267-7267). POPPA is a joint labor-management cooperative effort involving the implementation of a union-operated, alternative employee assistance program. Both HELPLINE and POPPA offer confidential services.

    4.     Members of the service with alcohol-related problems may also be referred to the Counseling Services Unit by supervisors, other Department units, or as the result of an alcohol related incident. However, the Department's objective, at all levels, is early detection and referral of personnel for evaluation and treatment *before* drinking causes problems in work performance or worse.

    5.     The Counseling Services Unit maintains strict standards of confidentiality as set forth in Title 42 of Federal guidelines governing alcoholism programs, and it does not act as part of the Department's disciplinary system. CSU's mission is to assist in recovery and return to full and productive service those members of the Department who are experiencing problems with alcohol. The unit operates 24 hours a day, seven days a week, and will help assess the extent of the problem, and make the appropriate referrals for treatment. Treatment can range from detoxification and inpatient rehabilitation to outpatient rehabilitation and the participation in self-support groups. Counseling is available to members of the service, their families and retirees.

6.      The Police Department's policy is to encourage members of the service to seek help in a supportive, confidential environment before the consequences of alcohol abuse require the Department to take disciplinary action.  In addition, to assist those members of the service experiencing alcohol related problems, all New York City Police Department personnel are encouraged to refer those with problems to any of the counseling/assistance providers indicated in paragraph three of this directive.

7.      Any provisions of the Department manual or other Department directives in conflict with the contents of this order are suspended.

**BY DIRECTION OF THE POLICE COMMISSIONER**

**DISTRIBUTION**
**All commands**

**INTERIM ORDER NO.  9**

2 of 2

Exhibit D



# PATROL GUIDE

| Section: Personnel Matters | Procedure No: 205-30 |
|---|---|

## ADMINISTRATION OF DRUG SCREENING TESTS FOR CAUSE

| DATE ISSUED:<br>01/01/2000 | DATE EFFECTIVE:<br>01/01/2000 | REVISION NUMBER: | PAGE:<br>1 of 4 |
|---|---|---|---|

**PURPOSE**     To investigate and detect illegal drug use by members of the service (uniformed and civilian).

**SCOPE**     The administration of drug-screening tests are procedures utilized by this Department to detect the presence of drugs in the urine or hair of members of the service suspected of illegal drug usage.  To balance the public interest in having a drug-free Police Department against the individual employee's right to privacy, drug-screening tests will be administered when there is a reasonable suspicion to believe that an individual member of the service (uniformed or civilian) is illegally using drugs. When reasonable suspicion does exist, the member suspected of using drugs <u>MUST</u> provide the drug-screening samples when directed; refusal will result in immediate suspension from duty and subsequent service of charges and specifications.

**PROCEDURE**     When a member of the service suspects that another member (uniformed or civilian) may be using drugs illegally:

**MEMBER OF THE SERVICE**     1.     <u>Immediately</u> notify commanding officer/duty captain <u>or</u> Internal Affairs Bureau Command Center ([212] 741-8401).

          a.     Provide rank, name and command of suspected member.

**COMMANDING OFFICER/ DUTY CAPTAIN**     2.     Notify Internal Affairs Bureau Command Center and obtain a log number.

<u>SUPERVISOR DIRECTED TO CONDUCT INVESTIGATION</u>

**SUPERVISOR CONDUCTING INVESTIGATION**     3.     Determine if a <u>REASONABLE SUSPICION</u> has been established indicating drug use.

**NOTE**     *Reasonable Suspicion - Exists when evidence or information, which appears reliable, is known to the police supervisor and is of such weight and persuasiveness as to make the supervisor, based upon his/her judgement and experience, reasonably suspect that a particular member of the service is illegally using drugs.  A reasonable suspicion that a member is illegally using drugs must be supported by specific articulable facts from which rational inferences may be drawn.  Reasonable suspicion cannot be based upon mere "hunch" or <u>solely</u> upon poor work performance.*

        4.     Prepare **INVESTIGATING OFFICER'S REPORT (PD313-153)** and record observations and other pertinent data.

**NOTE**     *If suspicion of drug use is based on observation of the suspected member's physical appearance, at least two (2) supervisors must make observations.*

        5.     Prepare a case folder for documentation of <u>all</u> aspects of investigation.

# NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 205-30 | 01/01/2000 | | 2 of 4 |

**SUPERVISOR CONDUCTING INVESTIGATION (continued)**

6. Confer with own immediate supervisor if reasonable suspicion has been established that member is using drugs illegally.
7. Contact bureau chief/counterpart/borough commander, upon completion of investigation to obtain approval for drug screening tests.
   a. If circumstances indicate drug-screening samples must be obtained expeditiously, <u>immediately</u> contact bureau chief/ counterpart/borough commander for approval.

**BUREAU CHIEF/ COUNTERPART/ BOROUGH COMMANDER**

8. Approve request for drug screening test <u>ONLY</u> after carefully determining that investigating supervisor's report has established reasonable suspicion.
9. Direct that member giving drug screening samples be placed on modified assignment pending results of test, unless other circumstances warrant suspension.

**NOTE**

*Approval of bureau chief/counterpart/borough commander <u>must</u> be obtained prior to administration of the drug-screening tests. If bureau chief/counterpart/borough commander is <u>not</u> available, executive officer concerned or duty chief, may be contacted for approval.*

**SUPERVISOR CONDUCTING INVESTIGATION**

10. Contact Medical Division ([718] 760-7632) when approval is received for administration of drug screening tests and obtain serial numbers.
    a. Obtain serial numbers even if member refuses tests.
    b. Include drug screening tests serial numbers in case folder along with all other documentation.

**NOTE**

*If Medical Division is closed, contact Sick Desk supervisor ([718] 760-7606).*

11. Advise member suspected of drug usage that refusal to give samples will result in immediate suspension from duty.
12. Notify the Department Advocate that drug screening tests were ordered, provide all pertinent information and obtain identity of member notified.
    a. Notify Medical Division to make entry in "Drug Screening Test Log" under caption "DEPARTMENT ATTORNEY NOTIFIED."

**MEMBER CONCERNED, MEDICAL DIVISION**

13. Inform investigating supervisor where samples will be taken and procedure to be followed.
14. Maintain "Drug Screening Test Log" in an appropriate Department record book, captioned across a double page, as follows:

| FIRST PAGE | | | | | | |
|---|---|---|---|---|---|---|
| DRUG SCREENING TEST# | DATE/TIME | NAME OF MEMBER TESTED | TAX REGISTRY NUMBER | COMMAND | MEMBER REQUESTING TEST | COMMAND |

| SECOND PAGE | | | | | | |
|---|---|---|---|---|---|---|
| DELIVERING OFFICER | DATE/TIME OF DELIVERY | DEPARTMENT ATTORNEY NOTIFIED | WITNESS TO TEST | RESULTS OF TEST | REMARKS |

**NEW • YORK • CITY • POLICE • DEPARTMENT**

**PATROL GUIDE**

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 205-30 | 01/01/2000 | | 3 of 4 |

*ADDITIONAL*
*DATA*

*A police surgeon, specifically a medical doctor employed by the Department, may order drug-screening tests without securing prior approval of the bureau chief/counterpart/ borough commander concerned. However, when a police surgeon desires tests for a member of the service he suspects of illegally using drugs, the police surgeon will confer with the Supervising Chief Surgeon or designee, if feasible.*

*To further protect the employee's right to privacy in those cases in which the results of the drug-screening test do not indicate the presence of a narcotic substance or marijuana, the investigator's case folder will be sealed. The folder will not be unsealed without the written authorization of the Deputy Commissioner - Legal Matters. The case folder will be filed in the appropriate borough Investigations Unit with a copy to the Internal Affairs Bureau. Furthermore, any reference to the administration of the drug-screening tests in the personal folder of the member concerned will be expunged.*

*An investigating supervisor finding controlled substances contraband, i.e., drugs or instruments used to administer drugs, e.g., hypodermic syringes/needles, crack pipes, etc., on or in the vicinity of a suspected member of the service (uniformed or civilian) will have such items invoiced on **PROPERTY CLERK'S INVOICE (PD521-141)** as investigatory evidence and comply with the pertinent provisions of P.G. 218-24, "Processing Controlled Substances/Marijuana Stored At Station Houses" and P.G. 218-25, "Processing Controlled Substances/Marijuana Not Stored At Station Houses". In addition, the investigating supervisor will have the following statement printed in large block letters on top of the INVOICE:*

*"NOT TO BE DESTROYED WITHOUT APPROVAL OF DEPARTMENT ADVOCATE'S OFFICE."*

*Privacy and dignity will be protected. The urine specimens will be given in maximum feasible privacy. Except in unusual circumstances, only one (1) person of the same sex will be present with the testee to observe the sample being given.*

*Two (2) urine samples will be taken, each in a separate vial. Prior to testing, the code number assigned by the Medical Division and date of test will be affixed to each vial. The code number will be logged separately with the member's name. The member being tested and the witness will then initial the vial stickers. The vials will be sealed in the member's presence after the urine sample has been given. Appropriate procedures will be followed at all times to maintain a chain of custody.*

*Three (3) samples of hair will be taken, cut as close to the scalp as possible. The samples should be taken from the same body area, preferably the head. The samples will be placed in the supplied envelopes, appropriately identified, sealed and initialed by both the subject and the collector. These envelopes will be placed in plastic bags and sealed by the collector and then initialed by the test subject. Appropriate procedures will be followed at all times to maintain a chain of custody.*

*One (1) or more scientifically accepted initial screening tests will be employed in analysis. Positive reports will be made only after final confirmation.*

*Positive test samples will be maintained by the analyzing laboratory in a secure area, and remain confidential unless and until Department disciplinary charges and specifications are served. A member whose test(s) are positive may, within sixty (60) days of notification of such results, submit a written request to the Department Advocate's Office for further retesting of the original sample(s).*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 205-30 | 01/01/2000 | | 4 of 4 |

**ADDITIONAL
DATA
(continued)**
*When retesting urine, a Department chemist and member designated by the Department will accompany the sample during retesting in order to preserve the chain of custody.
When retesting hair, the third sample of hair stored at the Medical Division will be forwarded to a lab of the member's choice. The lab must be certified to perform drug testing by New York State, the United States Department of Health and Human Services or the College of American Pathologists. Appropriate procedures will be followed at all times to maintain a chain of custody.*

*All retesting expenses, including chain of custody, will be paid by the affected member of the service.*

*Positive test results, which indicate illegal or illicit drug use, will result in Department charges and specifications, and suspension.*

*The unauthorized use or ingestion of commercially available products or substances including foods, cosmetics, and alleged health care products that contain or may contain illegal drugs (including marijuana) or their derivatives or active ingredients by any member of the service is prohibited. The unauthorized use or ingestion of these products would not be a valid defense for positive results on a drug test and would constitute sufficient cause for disciplinary action, including termination.*

**RELATED
PROCEDURES**
*Reporting Violations Observed By Supervisors (P.G. 206-01)
Preparation of Charges and Specifications (P.G. 206-05)
Service And Disposition Of Charges And Specifications (P.G. 206-06)
Interrogation Of Members Of The Service (P.G. 206-13)
Cause For Suspension/Modified Assignment (P.G. 206-07)
Suspension From Duty-Uniformed Menbers Of The Service (P.G. 206-08)
Modified Assignment (P.G. 206-10)*

**FORMS AND
REPORTS**
***INVESTIGATING OFFICER'S REPORT (PD313-153)
PROPERTY CLERK'S INVOICE (PD521-141)***

# NEW • YORK • CITY • POLICE • DEPARTMENT

Exhibit E



# PATROL GUIDE

| Section:  Personnel Matters | | Procedure No:    205-29 |
|---|---|---|
| **RANDOM DRUG SCREENING** | | |
| DATE ISSUED:<br>01/01/2000 | DATE EFFECTIVE:<br>01/01/2000 | REVISION NUMBER: | PAGE:<br>1 of 2 |

**PURPOSE**   To randomly test uniformed members of the service in an effort to establish a credible deterrent to illegal drug/controlled substance usage.

**SCOPE**   The Department's goal is to ensure that uniformed members of the service do not use illegal drugs or abuse drugs/controlled substances and maintain a high standard of performance in a safe, drug free environment.

*NOTE*   *Uniformed members of the service assigned to commands within the Organized Crime Control Bureau, Internal Affairs Bureau and probationary police officers in training at the Police Academy will be subject to separate random drug screening procedures.*

**PROCEDURE**   To randomly identify uniformed members of the service for illegal drug/ controlled substance testing:

**C.O., MEDICAL DIVISION**
1. Direct Management Information Systems Division to identify uniformed members of the service for automated random testing by utilizing the department's personnel database.
   a. Individual members selected for testing will be identified by social security number.
2. Direct members selected to appear at the Medical Division at appropriate date and time.

**UNIFORMED MEMBER OF THE SERVICE SELECTED FOR TESTING**
3. MUST report to Medical Division when notified, except if member is on:
   a. Sick report
   b. Regularly scheduled day off
   c. Military leave
   d. Annual vacation
   e. Terminal leave
   f. Bereavement leave.

*NOTE*   *Members previously scheduled for individual days off (other than regular days off) may be excused with the approval of the bureau chief concerned. Members scheduled for court or training on the 8x4 tour will appear for testing immediately upon completion of court or training session. Members scheduled for a 12x8 tour on both the day prior to and the scheduled test date will appear for testing during the 8x4 tour on the testing date. Members reporting sick on the assigned test date will be required to visit a Police Surgeon and obtain approval for excusal from the test. Members missing a scheduled test for any reason will be rescheduled for testing as soon as possible irrespective of any random sampling selection.*

4. MUST submit to drug screening. Refusal to submit to test will result in suspension and will be grounds for dismissal from the Department.
5. Prior to testing, prepare form listing all foods ingested in the past twenty-four (24) hours, and alcohol, mixers and medicine ingested in the past seventy-two (72) hours.
6. Present shield and identification card upon request at testing location to insure proper individual has reported for testing.
7. Comply with instructions received at testing location.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

**PATROL GUIDE**

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 205-29 | 01/01/2000 | | 2 of 2 |

**ADDITIONAL DATA**

*Privacy and dignity will be protected. Except in unusual circumstances, urine samples will be taken at a facility operated by the Medical Division, or at another health care facility. The samples will be given in maximum feasible privacy when urine samples are collected. Only one (1) person of the same sex will be present with the person being tested. Except in unusual circumstances, the monitor will be a supervisory officer/ health care professional assigned to the Medical Division. The supervisory officer/health care professional monitoring the procedure will observe the sample being given.*

*Two (2) samples will be taken, each in a separate vial. Prior to testing, a code number assigned to the member and the date of the testing will be affixed to each vial. The code number will be logged separately with the member's name. The member being tested will then initial the vial stickers. The vials will be sealed in the member's presence after the sample has been given. Appropriate chain of custody procedures will be followed at all times.*

*One (1) or more scientifically accepted initial screening tests will be employed in analysis. A positive report will be made only after final confirmation. Negative test results will not be maintained, but will be destroyed.*

*Positive test samples will be maintained by the analyzing laboratory in a secure area, and will remain confidential unless and until Department disciplinary Charges and Specifications are served. A member whose test is positive may, within sixty (60) days of notification of such result, submit a written request to the Department Advocate's Office for further independent retesting of the original sample.*

*For urine, a Department chemist and a member designated by the Department will accompany the sample during retesting in order to preserve the chain of custody. All retesting expenses, including chain of custody, will be paid by the affected member of the service.*

*Testing will only be done for illegal drugs and controlled substances. No other substances will be screened. The testing dates will not be announced in advance. Positive test results, which indicate illegal or illicit drug use, will result in department Charges and Specifications and suspension.*

*The unauthorized use or ingestion of commercially available products or substances including foods, cosmetics, and alleged health care products that contain or may contain illegal drugs (including marijuana) or their derivatives or active ingredients by any member of the service is prohibited. The unauthorized use or ingestion of these products would not be a valid defense for positive results on a drug test and would constitute sufficient cause for disciplinary action, including termination.*

**RELATED PROCEDURES**

*Suspension From Duty Uniformed Member Of The Service (P.G. 206-08)*
*Administration Of Drug Screening Tests For Cause (P.G. 205-30)*
*Drug Screening Tests For Uniformed Members Of The Service Applying For Assignments To The Internal Affairs Bureau And Detective Bureau (P.G. 205-31)*
*Drug Screening Tests For Uniformed Members Of The Service As A Condition Of Discretionary Promotion (P.G. 205-34)*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Exhibit F

# PATROL GUIDE



| Section:  Uniforms and Equipment | | Procedure No:    204-08 |
|---|---|---|

**FIREARMS
GENERAL REGULATIONS**

| DATE ISSUED:<br>02/23/01 | DATE EFFECTIVE:<br>02/28/01 | REVISION NUMBER:<br>01-01 | PAGE:<br>1 of 2 |
|---|---|---|---|

**EQUIPMENT
FIREARMS**

1.  Be armed at all times when in New York City, unless otherwise directed, or except as provided in item 2 below, with:
    a.  Service revolver/pistol or off duty revolver/pistol as specified in *P.G. 204-09, "Required Firearms And Equipment."*
2.  Be unarmed at own discretion while off duty when:
    a.  Possession of firearm, under the circumstances, would unnecessarily create a risk of loss or theft of the firearm, i.e., participation in sporting activities, attendance at beach and pool, etc., <u>OR</u>
    b.  On vacation, <u>OR</u>
    c.  Engaged in authorized off duty employment, <u>OR</u>
    d.  Engaged in any activity of a nature whereby it would be advisable NOT to carry a firearm, <u>OR</u>
    e.  There is any possibility that member may become unfit for duty due to the consumption of alcoholic intoxicants.

**NOTE**

*In those instances in which an off duty uniformed member is required to carry a firearm, the member concerned MUST CARRY either the regulation service revolver or pistol, or an authorized off duty revolver or pistol. A uniformed member who performs undercover duty and who has been authorized to carry a special weapon (see A.G. 305-05, "Authorization for Special Weapons") is permitted to carry the special weapon in lieu of the regulation firearms specified in P.G. 204-09 while off duty. The carrying of these firearms while off duty applies within the City and State of New York and also in those states outside New York State which permit visiting police officers to carry firearms within their state boundaries by virtue of their status as police officers.*

3.  Record all revolvers and pistols on **FORCE RECORD (PD406-143)**.
    a.  Service revolvers/pistols, and off duty revolvers/pistols must conform to the specifications and standards of the Firearms and Tactics Section, Police Academy.
4.  Do not modify revolvers or pistols without written permission of the Commanding Officer, Firearms and Tactics Section.
    a.  Modifications permitted will be entered on **FORCE RECORD**.
5.  Have service revolvers/pistols, and off duty revolvers/pistols not purchased at the Equipment Section inspected and tested by a Firearms and Tactics Section gunsmith prior to use.
6.  Carry handguns (gun collections, etc.), other than service and off duty guns, only while enroute to or from practice range or similar activity.

**NOTE**

*When carrying such weapons, member must be armed with an authorized on duty or off duty firearm. The firearm being transported that is not authorized for on duty or off duty use shall be unloaded.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 204-08 | 02/28/01 | 01-01 | 2 of 2 |

**EQUIPMENT**
**FIREARMS**
**(continued)**

7.  Safeguard weapons at all times.
8.  Do not store or leave firearm in an unattended motor vehicle.
9.  Do not carry firearms in briefcases, handbags, fanny packs, hip packs, tote bags, knapsacks, paper bags or similar devices.
10. Carry firearms, on the person, in an appropriate holster specifically designed to afford maximum protection against loss of weapon.

*NOTE*

*__All__ holsters, regardless of type, style, or design (i.e., ankle, shoulder or belt holster) must be specifically designed for the weapon being carried. "One size fits all," "Clip-on," and "belly band" holsters are __prohibited__.*

11. Use only approved Department issued ammunition for use in revolvers/pistols.
12. <u>For members authorized to carry service revolver</u> - Ensure that cylinder is fully loaded with appropriate ammunition. Maintain twelve (12) rounds of ammunition in two (2) speedloaders on duty belt.
    a.  Keep twelve (12) extra rounds of ammunition in locker at primary place of duty *or* on the duty belt in two (2) ammo pouches.
13. <u>For members authorized to carry 9MM pistol</u> - Ensure that one (1) round of ammunition is in the chamber and fifteen (15) rounds in the magazine at all times.
    a.  Maintain fifteen (15) rounds in each of the two (2) magazines carried on the duty belt.

*NOTE*

*Those uniformed members of the service authorized to carry specialized undercover firearms as per A.G. 305-05, "Authorization for Special Weapons," will also ensure that the maximum number of rounds are loaded in each magazine, and that a round is loaded in the chamber of the weapon, as applicable.*

14. Comply with *P.G. 205-03, "Responsibility For Weapons While Sick,"* if member expects to go on extended sick leave.
15. Carry ONLY authorized firearms when on duty.
    a.  Permission of commanding officer is required PRIOR to carrying special weapons while performing duty (see *A.G. 305-05, "Authorization For Special Weapons").*
16. Do not enter Family Court or Supreme Court Matrimonial Parts while armed if involved, OTHER THAN AS ARRESTING OFFICER OR ON OFFICIAL BUSINESS, in Family Court case or Supreme Court matrimonial case.
    a.  Safeguard firearms at a location other than Family Court or Supreme Court OR if within New York City, the member concerned may elect to deliver firearm to desk officer of precinct in which Family Court or Supreme Court is located.
    b.  Uniformed member of the service present at Family Court or Supreme Court as an arresting officer or on official business will report to the court officer supervisor and sign the Law Enforcement Officer log.

# NEW • YORK • CITY • POLICE • DEPARTMENT

Exhibit G



# PATROL GUIDE

| Section: Disciplinary Matters | | Procedure No: 206-12 | |
|---|---|---|---|
| **REMOVAL OF FIREARMS FROM INTOXICATED UNIFORMED MEMBER OF THE SERVICE** | | | |
| DATE ISSUED:<br>10/10/03 | DATE EFFECTIVE:<br>10/17/03 | REVISION NUMBER:<br>03-04 | PAGE:<br>1 of 2 |

**PURPOSE**  To determine if an on/off duty uniformed member of the service is unfit for duty due to intoxication.

**DEFINITION**  <u>INTOXICATION</u> - Unfitness for duty due to the influence of alcohol, narcotics, or other drug, or under circumstances in which surrounding events of a timely nature indicate that the member may have been intoxicated during an earlier period directly related to the incident in question.

**PROCEDURE**  Upon observing a uniformed member of the service who appears unfit for duty due to intoxication:

**SUPERVISORY MEMBER**

1. Direct that member remain at Department facility or other location pending the arrival of commanding officer/duty captain.
2. Prepare, immediately, **SUPERVISOR'S FITNESS FOR DUTY REPORT (PD469-150)** based upon observations of member of the service.
3. Notify precinct commander/duty captain to respond to facility.

**COMMANDING OFFICER/ DUTY CAPTAIN**

4. Prepare, immediately, **SUPERVISOR'S FITNESS FOR DUTY REPORT** based upon observations of member of the service.
5. Conduct an investigation to determine if member is unfit for duty due to intoxication at the time of the alleged misconduct.

**NOTE**  *Common sense standards will be applied to determine whether a member of the service is unfit for duty due to intoxication. Commanding officers/duty captains will examine the totality of the circumstances and will consider all credible relevant information when determining a member's fitness for duty. Such information will include all SUPERVISOR'S FITNESS FOR DUTY REPORTS prepared, any witness statements made by civilians or members of the service, and any available scientific evidence (Breathalyzer, blood test, etc.). On the basis of all available information, viewed in light of the time elapsed since any alleged acts of misconduct or since the first supervisory observation of the member, the commanding officer/duty captain will conclude whether the member was unfit for duty at the time of the alleged misconduct.*

6. Remove firearms when it is determined that member is intoxicated (see *P.G. 206-17, "Removal And Restoration Of Firearms"*).
7. Place member on modified assignment or suspend from duty, as appropriate.
8. Advise member of availability of Counseling Service Program.

**NOTE**  *A supervisory officer is mandated in all cases to contact the Counseling Services Unit on behalf of a member who is placed on modified assignment, suspended, or has his/her firearms removed due to being unfit for duty. The services of the Counseling Service Program are not available to personnel for illegal drug use and/or abuse problems.*

# NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 206-12 | 10/17/03 | 03-04 | 2 of 2 |

**COMMANDING OFFICER/ DUTY CAPTAIN** *(continued)*

9. Have supervisory officer contact Counseling Service **DIRECT**, during normal business hours. At other times, conferral with a counselor may be requested by contacting the Sick Desk supervisor.

10. Prepare five (5) copies of all completed **SUPERVISOR'S FITNESS FOR DUTY REPORTS** (commanding officer/duty captain's and referring supervisor's).

11. Prepare seven (7) copies of a report on **Typed Letterhead** detailing observations and circumstances that led to determination that member was unfit for duty and forward each, with copies of all **SUPERVISOR'S FITNESS FOR DUTY REPORTS**, as follows:

    a.    First Deputy Commissioner - Original (DIRECT)
    b.    First Deputy Commissioner (THOUGH CHANNELS)
    c.    Chief of Department (DIRECT)
    d.    Chief of Personnel (DIRECT)
    e.    Deputy Commissioner - Trials
    f.    Department Advocate's Office
    g.    Member's commanding officer.

**ADDITIONAL DATA**

*Prior to final adjudication of a disciplinary matter, in all misconduct cases in which the use of alcohol is indicated, a conferral with the Early Intervention Unit must be made, and an alcoholism assessment by the Counseling Services Unit, must be conducted. In addition, in appropriate cases, final adjudication of the disciplinary matter will be held in abeyance pending completion of treatment for alcoholism. The Department Advocate's Office or the Office of the Special Prosecutor, as appropriate, are required to ensure that these steps are taken.*

**RELATED PROCEDURES**

*Cause For Suspension Or Modified Assignment (P.G. 206-07)*
*Suspension From Duty (P.G. 206-08)*
*Modified Assignment (P.G. 206-10)*
*Administration Of Drug Screening Tests For Cause (P.G. 205-30)*
*Removal/Restoration Of Firearms (P.G. 206-17)*

**FORMS AND REPORTS**

*SUPERVISOR'S FITNESS FOR DUTY REPORT (PD469-150)*
*Typed Letterhead*

# NEW • YORK • CITY • POLICE • DEPARTMENT

Exhibit H



# PATROL GUIDE

| Section: Command Operations | Procedure No: 212-29 |
|---|---|

**FIREARMS DISCHARGE BY UNIFORMED MEMBERS OF THE SERVICE**

| DATE ISSUED: 01/01/2000 | DATE EFFECTIVE: 01/01/2000 | REVISION NUMBER: | PAGE: 1 of 9 |
|---|---|---|---|

**PURPOSE**  To record and evaluate incidents in which uniformed members of the service discharge firearms.

**NOTE**  *A firearms discharge does not include a discharge during an authorized training session or while lawfully engaged in target practice or hunting. Additionally, it does not include a firearms discharge at a firearms safety station within a Department facility. See ADDITIONAL DATA for accidental firearms discharge at a firearms safety station.*

**DEFINITION**  PATROL BOROUGH SHOOTING TEAM - Consists of, on an ad hoc basis, personnel assigned to the Borough Investigations Unit, Detective Bureau, Emergency Service Unit, community affairs officers, precinct patrol supervisors and precinct police officers.

SHOOTING TEAM LEADER - Each patrol borough shooting team will have as its leader one (1) of the following ranking officers: Commanding Officer, Borough Investigations Unit or, one (1) of the number of captains designated by the borough commander and approved by the Chief of Department.

**NOTE**  *When appropriate, the shooting team leader can request the assistance of personnel assigned to the Internal Affairs Bureau, Office of Deputy Commissioner - Public Information, Office of Deputy Commissioner - Community Affairs, Office of Deputy Commissioner - Legal Matters, etc. However, in all cases involving an injury as a result of a firearms discharge, a notification regarding the incident must be made to the Internal Affairs Bureau, Command Center. Additionally, borough commanders will implement a plan to equitably distribute shooting investigations among shooting team leaders and ensure their availability, whether on or off duty, at all times.*

INVESTIGATING OFFICER - Shooting team leader conducts investigation, whenever a uniformed member of the service discharges a firearm, and signs required report, under the supervision of:

a.   Duty inspector when no personal injury occurs or when a perpetrator or bystander sustains a non-serious firearms injury

b.   Duty chief when anyone is killed or seriously injured by gunshot or a uniformed member of the service is injured by gunshot.

**NOTE**  *When no shooting team leaders are on duty and a uniformed member of the service discharges a firearm which results in an injury, the patrol borough concerned will activate a shooting team leader from off-duty. In such cases, the precinct commanding officer/ duty captain will respond to the scene and take charge of the investigation. When the shooting team leader arrives, the leader will be briefed by the precinct commanding officer/duty captain and will thereupon assume responsibility for the investigation (see Appendix "A").*

*Commanding/executive officer, precinct of occurrence/duty captain conducts investigation and signs required report, under the supervision of the duty inspector, whenever a uniformed member of the service discharges a firearm under circumstances where there:*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 2 of 9 |

| | | |
|---|---|---|
| **NOTE**<br>**(continued)** | *a.* | *Is no injury to a person, and* |
| | *b.* | *No shooting team leaders on duty.* |
| | | *(Commanding officers of Transit Bureau districts and Housing Bureau police service areas where the incident occurred, if on duty at the time of the shooting, will perform this function when the incident involves uniformed members of the service within their respective jurisdictions (see Appendix "A").* |

*Interim and final reports on firearm discharges, initially reported by shooting team leaders, will be the responsibility of the Commanding Officer, Patrol Borough Investigations Unit. The commanding officer, precinct of occurrence, will be responsible for interim and final reports initially investigated by non-shooting team ranking officers (see Appendix "A").*

**PROCEDURE**  When a uniformed member of the service discharges a firearm either on or off-duty:

**UNIFORMED**  1.  Request patrol supervisor, and:
**MEMBER OF**        a.  Call for ambulance and render assistance to injured, if necessary
**THE SERVICE**      b.  Safeguard the scene.

**NOTE**  *If firearm is discharged outside New York City, uniformed member of the service concerned will promptly report discharge to local police authorities and the Operations Unit, either personally or by responsible messenger. Pursuant to the investigation of these incidents, investigating officers may use Department vehicles without obtaining prior permission, if responding outside the City but within the residence counties. Incidents occurring outside the City but within the residence counties will be investigated as follows:*
   *a.  Patrol Borough Bronx will assign an investigating officer to conduct investigations in Westchester, Rockland, Orange or Putnam Counties.*
   *b.  Patrol Borough Queens South and Patrol Borough Queens North will alternately assign an investigating officer to conduct investigations in Nassau or Suffolk Counties.*

**PATROL**  2.  Respond to scene and take command.
**SUPERVISOR**      a.  Establish crime scene, if necessary
                    b.  Notify the desk officer.

**DESK OFFICER**  3.  Notify precinct commanding officer/executive officer, Operations Unit and patrol borough command, without waiting for details.
                    a.  Notify Internal Affairs Bureau, Command Center, <u>immediately</u>, if an injury is involved.

**OPERATIONS**  4.  Notify duty chief.
**UNIT**

**PATROL**  5.  Notify:
**BOROUGH**         a.  Duty inspector
**COMMAND**         b.  Appropriate investigating officer, i.e., duty captain, shooting team leader.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 3 of 9 |

**DUTY INSPECTOR**

6.   Respond to scene, and:
     a.   Confer with commanding officer or executive officer/duty captain/shooting team leader.

**INVESTIGATING OFFICER**

7.   Respond to scene and conduct investigation.

8.   Notify District Attorney's Office in all shooting cases.
     a.   Confer with District Attorney before interviewing uniformed member(s) of the service.

**NOTE**

*Unresolved issues with the District Attorney will be brought to the attention of the duty inspector/duty chief and be guided by their direction.*

9.   Interview:
     a.   Witnesses
     b.   Other persons involved
     c.   Uniformed member concerned, if appropriate.

10.   Direct patrol supervisor to inspect firearms for evidence of recent discharge (i.e., presence of spent rounds).
     a.   Have Firearms Analysis Section notified if firearm was discharged.

**NOTE**

*If anyone was injured as a result of police firearms discharge, direct patrol supervisor to secure all weapons that were discharged. A member assigned to the Borough Investigations Unit will transport the firearm(s) to the Firearms Analysis Section.*

11.   Direct uniformed member concerned to prepare **FIREARMS DISCHARGE/ASSAULT REPORT (PD424-151).**
     a.   Direct patrol supervisor to prepare **REPORT**, if uniformed member concerned is incapacitated.

12.   Assign uniformed member(s) of the service involved, temporarily, to patrol borough office of assignment, or counterpart, for a minimum of three (3) consecutive scheduled tours (exclusive of sick time or regular days off), if firearms discharge causes death or injury.

13.   Notify Operations Unit and patrol borough command of details of investigation and temporary assignment of uniformed member concerned, if such assignment was made.

14.   Prepare report on **Typed Letterhead**, addressed to the Chief of Department, based on "Firearms Discharge Manual, A Guide to the Preparation of a Shooting Incident Report."
     a.   Include findings as to whether firearms discharge was within or outside Department guidelines, if investigation is completed, and
     b.   Include any recommendations, as per the following schedule:
         (1)   FINDINGS
            (a)   No violation of Department firearms guidelines
            (b)   Violation of Department guidelines
            (c)   Accidental discharge - violation
            (d)   Accidental discharge - no violation

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 4 of 9 |

**INVESTIGATING OFFICER** (continued)

(2)    RECOMMENDATIONS

(a)    No corrective action to be taken

(b)    Member concerned to review the law and instructions

(c)    Member concerned to have additional firearms instructions

(d)    Retraining in tactics re: _____

(e)    Current assignment of member be reviewed

(f)    Other (Command Discipline, Charges and Specifications, etc.) re: _____

**NOTE**

*Ordinarily, there will be one (1) "finding" per firearms discharge incident and one (1) or more "recommendations" about follow-up action to be taken. However, an incident involving multiple firearms discharges by an individual uniformed member of the service may have more than one (1) "finding." For example, an incident wherein two (2) rounds are fired may have a "finding" that one (1) discharged round was "No violation of Department firearms guidelines," and the other fired round was a "Violation of Department guidelines." In these split "findings" cases, the investigating officer will clearly specify the nature of each fired round.*

*In many cases the investigating officer's determination about the shooting being "within/outside" the Department's guidelines will be reserved for the future when the investigation is completed, e.g., following the interview of uniformed member concerned (see P.G. 206-13, "Interrogation of Members of the Service", presentation to grand jury, or completion of a criminal trial. However, other co-relative decisions will not be postponed. For example, regarding behavior or violations of Department guidelines, immediate action will be taken when the member's behavior is erratic, e.g., refer to Psychological Services, if appropriate, or derelictions are uncovered, e.g., initiate disciplinary actions. These actions will be described in the initial report in its "Miscellaneous" section.*

c.    Indicate in report the time and date uniformed member concerned was temporarily assigned to patrol borough/ counterpart command.

15.    Review and sign report.

a.    Distribute as follows:

(1)    Original and first copy - to Chief of Department's Investigation Review Section, Firearms Discharge Review Board, Room 1100A, Police Headquarters, DIRECT.

(a)    Attach first copy of **FIREARMS DISCHARGE/ ASSAULT REPORT.**

(2)    Copy - Deputy Commissioner, Policy and Planning, (if death or injury)
Chief of Department
Chief of Patrol
Chief of Housing Bureau, if appropriate
Chief of Personnel
Chief of Transit Bureau, if appropriate
Commanding Officer, Firearms and Tactics Section
Patrol borough commander
Uniformed member's commanding officer, if other than precinct of occurrence.

16.    Distribute remaining copies of **FIREARMS DISCHARGE/ASSAULT REPORT**, as indicated on form.

## NEW • YORK • CITY • POLICE • DEPARTMENT

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 5 of 9 |

**PATROL BOROUGH/ COUNTERPART COMMANDER**

17.   Prepare report on **Typed Letterhead** for bureau chief concerned reviewing temporary assignment of uniformed member(s) of the service concerned.
     a.    Recommend continuance or discontinuance, as appropriate.

*NOTE*

*Uniformed member(s) of the service involved in such incidents will not be returned to permanent command without prior approval of Chief of Department.*

**COMMANDING/ EXECUTIVE OFFICER, MEMBER CONCERNED**

18.   Conduct <u>informal</u> interview of uniformed member(s) concerned, <u>after</u> initial investigation is completed.
     a.    Inquire about uniformed member's well being
     b.    Offer any assistance deemed appropriate including the services of the Counseling Services Unit, Employee Relations Section (see *P.G. 205-08, "Trauma Counseling Program"*).
19.   Conduct a follow-up interview of the uniformed member concerned within twenty-four (24) to forty-eight (48) hours.
     a.    Observe uniformed member's post trauma reaction.
     b.    Repeat offer of the Counseling Services Unit services.

**COMMANDING OFFICER, BOROUGH INVESTIGATION UNIT/PCT OF OCCURRENCE**

20.   Prepare <u>final report</u> on **Typed Letterhead** <u>within ninety (90) days of the incident</u>.
     a.    Submit interim reports on a monthly basis, if unable to comply within ninety (90) days, indicating reason for delay, e.g., District Attorney requested delaying interview of uniformed member(s) concerned, etc.
     b.    Include, in the <u>final report</u>, all information <u>not</u> available at the time of the initial report, <u>and</u>
          (1)    Findings and recommendations
          (2)    Medical Examiner's report
          (3)    Ballistics report
          (4)    Department Gunsmith's report (accidental discharges)
          (5)    Synopsis of uniformed member(s) statements
          (6)    Statement that Communications Section tapes were audited and are consistent or not consistent with uniformed member(s)/witnesses' statements
          (7)    District Attorney/grand jury findings, if applicable
          (8)    Internal Affairs Bureau findings, if applicable.
21.   Forward report to Chief of Department, as follows:
     a.    <u>Original</u> - <u>DIRECT</u> to Chief of Department's Investigation Review Section
     b.    <u>Duplicate</u> - through channels.

*NOTE*

*The Commanding Officer, Investigation Review Section will note all cases not finalized by the first anniversary of their occurrence due to a District Attorney's request to refrain from interviewing the uniformed member of the service under P.G. 206-13, "Interrogation of Members of the Service." A report of these cases will be forwarded to the Deputy Commissioner-Legal Matters. The Deputy Commissioner-Legal Matters will confer with the appropriate District Attorney to expedite judicial proceedings so that the shooting investigation can be finalized without undue delay. The Deputy Commissioner-Legal Matters will report the results of his/her conferral on Typed Letterhead to the Chief of Department.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

## PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 6 of 9 |

| | | |
|---|---|---|
| **PATROL BOROUGH COMMANDER** | 22. | Call meeting of borough Firearms Discharge Review Board on a monthly basis. |
| **BOROUGH FIREARMS DISCHARGE REVIEW BOARD** | 23. | Review incident and sustain/alter findings and recommendations previously made. |
| | 24. | Prepare report, addressed to the Department Firearms Discharge Review Board, containing findings and recommendations per the schedule in step 14. |
| *NOTE* | | *Each member must sign report.* |
| **PATROL BOROUGH COMMANDER** | 25. | Endorse findings and recommendations to Chief of Department's Firearms Discharge Review Board including: |
| | | a.    Summary of findings |
| | | b.    Indication of concurrence with findings and recommendations |
| | | c.    Current duty status and assignment of uniformed member(s) concerned. |

*ADDITIONAL DATA*

<u>*FIREARMS DISCHARGE BY UNIFORMED MEMBERS OF THE SERVICE*</u>

*Investigating officers conducting the preliminary investigation will attempt to ascertain and note in the preliminary report on* **Typed Letterhead***, any action, statement, clothing or equipment utilized by* <u>*civilian clothed*</u>, *uniformed members of the service concerned to identify the uniformed member(s) as police officers (see step 13, "Firearms Discharge Manual," [M.O.S. Description]). Additionally, the investigating officer preparing the final report on* **Typed Letterhead** *will include any additional information concerning identification which is obtained during the course of the subsequent investigation, including information obtained through interviewing civilian witnesses and/or the uniformed member(s) concerned, pursuant to the provisions of P.G. 206-13, "Interrogation of Members of the Service."*

*If a person is killed as a direct result of police action, the uniformed member of the service involved will* <u>*not*</u> *be assigned to identify the body at the morgue. Another uniformed member of the service, who can identify the body, will be assigned.*

*While a firearms discharge at a safety station within a Department facility does not require a report based on the "Firearms Discharge Manual" as per step 14 of this procedure, it does require a brief report by the uniformed member's commanding officer to the Commanding Officer, Firearms and Tactics Section.*

*In all cases of firearms discharge, the firearm of the uniformed member concerned will be delivered to and examined by the Firearms Analysis Section. If accidental discharge of a firearm is alleged, the investigating officer will direct that after Firearms Analysis Section examination, the firearm be delivered to the Firearms and Tactics Section, Outdoor Range, at Rodman's Neck for examination by a Department gunsmith. Department gunsmiths are available Monday to Friday, 0730 to 2300 hours. Uniformed member(s) concerned will not use the firearm(s) in question until such examination is completed (see P.G. 204-12, "Repair/Replacement of Authorized Firearms"). If uniformed member's service revolver/pistol has accidentally discharged and the incident occurs when a Department gunsmith is not available, the uniformed member concerned will be assigned to non-enforcement duty pending repair or replacement of the firearm.*

## NEW • YORK • CITY • POLICE • DEPARTMENT

**PATROL GUIDE**

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 7 of 9 |

**ADDITIONAL DATA (continued)**

The *FIREARMS DISCHARGE/ASSAULT REPORT* is the primary method used by the Department to gather intelligence information regarding incidents which are life-threatening for police officers. The effectiveness of tactics training in identifying dangerous new criminal practices and in promoting safe new habits by uniformed members of the service depends upon the accuracy and completeness of these reports.

*FIREARMS DISCHARGE INVESTIGATIONS-ACCIDENTAL DISCHARGES AND SELF-INFLICTED WOUNDS*

During the initial investigation of an incident involving a firearm discharge by a member of the service), information sometimes indicates that the firearm was discharged under accidental circumstances (with or without injury or death), or may have apparently been a self-inflicted wound. In all such cases, the ranking officer responsible for conducting the investigation *must* determine whether the firearms removal procedure (P.G. 206-17, "Removal And Restoration Of Firearms) would be appropriate.

All firearms discharge investigation reports under accidental circumstances shall include a finding and recommendation under Miscellaneous Information (Para. 25 - standard format) whether or not the member's firearms should be removed. In all cases of apparently self-inflicted wounds, absent mitigating circumstances, firearm removal is *mandatory*.

Members do *not* have to be suspended or placed on modified assignment in order to have their firearms removed. When the ranking member conducting the investigation determines that a firearms removal is appropriate, P.G. 206-17, "Removal And Restoration Of Firearms," shall be followed.

The circumstances of each case shall be judged on their own merit. Factors such as on/off duty status, fitness for duty, contributing circumstances (e.g., struggle with suspect), shooting range incidents etc., shall be considered in making a determination about the necessity of firearms removal.

When firearms removal would not be appropriate, if an accidental discharge of a firearm is alleged, the investigating officer will direct that after ballistics examination, the firearm be delivered to the Firearms and Tactics Section, Outdoor Range, at Rodman's Neck for examination by a department gunsmith (gunsmiths are available Monday to Friday, 0730 to 1530 hours). Members concerned will not use firearm in question until such examination is completed (see P.G. 204-12, "Repair/ Replacement of Authorized Firearms"). If member's service firearm has accidentally discharged and the incident occurs when a department gunsmith is not available, such member will be assigned to non-enforcement duty pending repair or replacement of the firearm.

In all firearm discharge cases, the ranking investigator shall determine whether a referral should be made to the Early Intervention Unit, Counseling Service, or Trauma Counseling Program. When a member is shot, or causes, accidentally or otherwise, serious injury or death to another, the member will be referred to the Trauma Counseling Program.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 8 of 9 |

| | |
|---|---|
| **ADDITIONAL DATA (continued)** | *All uniformed members of the service who discharge a firearm, on or off duty, at other than an approved firing range, will attend a tactics review session conducted by the Firearms and Tactics Section. The dates, times, locations, required equipment, and other provisions governing the review sessions will be the subject of a yearly Department directive.* |
| **RELATED PROCEDURES** | *Interrogation of Members of the Service (P.G. 206-13)*<br>*Line of Duty Injury or Death Occurring Within City (P.G. 205-05)*<br>*Line of Duty Injury or Death Occurring Outside City in Residence Counties (P.G. 205-06)*<br>*Removal and Restoration of Firearms (P.G. 206-17)*<br>*Trauma Counseling Program (P.G. 205-08)*<br>*Repair/Replacement of Authorized Firearms (P.G. 204-12)*<br>*Boards and Committees (O. G. 101-23)* |
| **FORMS AND REPORTS** | ***FIREARMS DISCHARGE/ASSAULT REPORT (PD424-151)***<br>***Typed Letterhead*** |

## RESPONSIBILITY FOR SHOOTING INVESTIGATION

### Type of Shooting

| | No Injury | Injury<br>Initial Report |
|---|---|---|
| *Duty Captain* | See Note. | No. However, he/she will promptly respond to scene and initiate investigation until the arrival of the Shooting Team Leader. |
| *Shooting Team Leader* | Yes, if on duty at time of the firearm discharge. | Yes. |
| *C.O. (X.O.) of Housing Bureau PSA (Area of Occurrence)* | See Note. | No. However, if on-duty, he/she will promptly respond to scene and initiate investigation with the assistance of the Duty Captain until the arrival of the Shooting Team Leader. |
| *C.O. (X.O.) of Transit District (Area of Occurrence)* | See Note | No. However, if on-duty he/she will promptly respond to scene and initiate investigation with the assistance of the Duty Captain until the arrival of the Shooting Team Leader. |

# NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-29 | 01/01/2000 | | 9 of 9 |

**NOTE**    *All firearms discharges by uniformed members of the service will be investigated by a Shooting Team Leader if one is on duty at the time of the shooting. If none is on duty and anyone is injured by a firearms discharge, the borough will activate a Shooting Team Leader from off duty status. If none is on duty and no one has been injured, the investigation will be conducted by the duty captain concerned. (This function will be performed by the Commanding Officer or Executive Officer, precinct of occurrence, if he/she is on duty. In addition, non-injury shootings involving on duty uniformed members of the service assigned to the Housing Bureau and Transit Bureau, when occurring on Housing or Transit facilities, will be conducted by the Commanding Officer of the PSA concerned or the Commanding Officer of the transit district concerned if he/she is on duty at the time of the shooting.) Further, if an incident involves firearms discharges by multiple officers assigned to the Housing Bureau or Transit Bureau and other Department bureaus, the investigation will be conducted by the Patrol Services Bureau Duty Captain.*

*Interim and final reports relative to police shootings will be prepared by:*
*The Commanding Officer, Borough Investigations Unit concerned whenever the initial report is prepared by a Shooting Team Leader.*

*The Commanding Officer, precinct of occurrence whenever the initial report is prepared by a non-Shooting Team Leader.*

**NEW • YORK • CITY • POLICE • DEPARTMENT**

Exhibit I

# PATROL GUIDE



| Section:  Command Operations | Procedure No:  212-53 |
|---|---|

### COMMAND RESPONSIBILITIES WHEN A PERSON DIES OR SUSTAINS A SERIOUS INJURY IN CONNECTION WITH POLICE ACTIVITY

| DATE ISSUED: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 01/01/2000 | 01/01/2000 |  | 1 of 3 |

**PURPOSE**    To establish command responsibility and notification requirements when a person dies, is seriously injured in connection with a police activity, or sustains an injury resulting from a police firearms discharge.

**DEFINITION**    <u>POLICE ACTIVITY</u> - includes, but is not limited to:
    a.    Any death while in police custody.
    b.    Serious injury suffered by a person (prisoner/EDP) prior to police custody, (i.e., community intervention prior to police arrival, etc.) self inflicted serious injury.
    c.    Police use of force resulting in serious injury.
    d.    Death or serious injury to a person fleeing from a police foot or vehicle pursuit.
    e.    Serious physical injury of a person resulting from police restraint, (i.e., EDP).
    f.    Any injury to a person resulting from a police firearms discharge.

**PROCEDURE**    When a person dies, is seriously injured in connection with a police activity, or sustains an injury resulting from a police firearms discharge:

**UNIFORMED**    1.    Immediately request the response of the patrol supervisor, and
**MEMBER OF**        a.    Safeguard possible crime scene.
**THE SERVICE**        b.    Provide and/or secure appropriate medical attention for the injured person.

**PATROL**    2.    Respond to scene, assess the situation.
**SUPERVISOR**    3.    Notify the desk officer.
    4.    Establish crime scene, if necessary.

**DESK OFFICER**    5.    Make the following notifications:
    a.    Borough command
    b.    Operations Unit
    c.    Commanding officer/duty captain
    d.    Internal Affairs Bureau, Command Center
    e.    Detective squad and borough commands.

**OPERATIONS**    6.    Notify duty chief.
**UNIT**

**PATROL**    7.    Notify duty inspector.
**BOROUGH**    8.    Notify shooting team leader when:
**COMMAND**        a.    Injury occurs as a result of a police shooting.
    b.    Requested by duty inspector regarding a death in custody or serious injury in connection with police activity.

## NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-53 | 01/01/2000 | | 2 of 3 |

**NOTE**   *Notifications to next of kin in ALL cases where a person dies while in police custody will be the responsibility of the Borough Commander and/or a member of their staff.*

**DUTY INSPECTOR**
9.   Respond to scene.
10.   Confer with commanding officer/duty captain/shooting team leader.
11.   Confer with Internal Affairs Bureau Response Team.

**IAB RESPONSE TEAM**
12.   Respond to scene.
13.   Confer with commanding officer/duty captain/shooting team leader.
14.   Advise Internal Affairs Bureau Duty Captain, as appropriate.

**COMMANDING OFFICER/ DUTY CAPTAIN/ SHOOTING TEAM LEADER**
15.   Respond and assess the situation.
16.   Confer with Internal Affairs Bureau Duty Captain/Internal Affairs Bureau Response Team.

WHEN IT IS DETERMINED THAT A POSSIBLE CRIMINAL INVESTIGATION WILL COMMENCE:

**INTERNAL AFFAIRS BUREAU, DUTY CAPTAIN**
17.   Respond and assess the circumstances.
18.   Confer with the commanding officer/duty captain/shooting team leader.

**PATROL SERVICES BUREAU DUTY CHIEF**
19.   Respond to scene and assume command.
20.   Confer with duty inspector/commanding officer/duty captain/shooting team leader, and Internal Affairs Bureau Duty Captain to determine if a criminal investigation against a member of the service is warranted.
21.   Assume responsibility for the non-criminal investigation when:
    a.   Person dies in custody.
    b.   Person sustains any injury resulting from police firearms discharge.
    c.   Person sustains a serious injury in connection with a police activity.

**NOTE**   *When a criminal investigation against a member is required, the Internal Affairs Bureau will be responsible for the investigation.*

IF CRIMINAL INVESTIGATION AGAINST A MEMBER IS REQUIRED:

**PATROL SERVICES BUREAU DUTY CHIEF**
22.   Confer with the Chief of Detectives and Chief of Internal Affairs, as appropriate.
23.   Coordinate the activities of the Detective Bureau and Internal Affairs Bureau personnel.

# NEW • YORK • CITY • POLICE • DEPARTMENT

# PATROL GUIDE

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 212-53 | 01/01/2000 | | 3 of 3 |

**NOTE**

In those cases where no criminal investigation by the Internal Affairs Bureau is required the follow-up investigation, including interviews conducted under P.G. 206-13, "Interrogation Of Members Of The Service" will be conducted by the borough commanding officer or designee.

If at any time during the investigation, it becomes apparent that a criminal investigation is required, the Internal Affairs Bureau will be notified and will take over responsibility for the criminal investigation, including any additional interviews.

**ADDITIONAL DATA**

When it is determined that the Internal Affairs Bureau will conduct the investigation, the local detectives will provide assistance (e.g., canvass interviews, etc.), as necessary. Conversely, when it is determined that Detective Bureau personnel will conduct the investigation, the Internal Affairs Bureau will provide assistance as requested by the Detective Bureau. The patrol borough Investigations Unit will also participate in these investigations, where warranted.

When, in the course of an investigation, (i.e., investigate DOA), a member of the Detective Bureau becomes aware that a death or serious injury was or may have been in connection with a police action, the precinct commanding officer/duty captain and the Internal Affairs Bureau will be _immediately_ notified.

Whenever a person dies while in police custody or sustains death or serious injury in connection with a police activity, or sustains death or injury resulting from a police firearms discharge, forward copy of **Typed Letterhead** to Deputy Commissioner - Policy and Planning, 1 Police Plaza, Room 1403.

**RELATED PROCEDURES**

Interrogation of Members of the Service (P.G. 206-13)

**FORMS AND REPORTS**

**Typed Letterhead**

# NEW • YORK • CITY • POLICE • DEPARTMENT

Exhibit J

<u>REPORT UNDER:</u>
**PATROL GUIDE** 212-29
**CDFDRB #**          03-45
**SCBN FDRB #**       03-12

**POLICE DEPARTMENT
CITY OF NEW YORK**

May 22, 2003

From:        Shooting Team Leader, SATCOM., Brooklyn North

To:          Chief of Department

Subject:     **FIREARMS DISCHARGE BY AN ON-DUTY, PLAINCLOTHED,
             MEMBER OF THE SERVICE WITHIN THE CONFINES OF THE 77
             PRECINCT. SUBJECT AND PLAINCLOTHESED MEMBER EACH
             RECEIVED NON-LIFE-THREATENING GUNSHOT INJURIES. THE
             SUBJECTS TWO FIREARMS WERE RECOVERED. NO PROPERTY
             DAMAGE.**

1.    **OPENING:**

On Thursday, May 22, 2003, at approximately 0013 hours, P.O. ***** *****, tax #
*****, 77 Anti-Crime Unit, discharged a firearm seven (7) times at a subject. That
weapon had been recovered from the subject during a Stop and Frisk encounter. Those
discharges caused the subject to sustain several gunshot wounds. Officer *****
sustained a single gunshot injury to his right foot in addition to receiving a gunshot
strike to his Department issued vest. The hit to his vest caused Officer ***** to
sustain blunt trauma and lacerations to his chest. One additional firearm was recovered
at the scene, in the immediate vicinity of the subject following the exchange. No
property damage was incurred. Details are as follows.

2.    **INVESTIGATION:**

This firearms discharge was investigated by the undersigned, Captain Timothy J.
Trainor, Shooting Team Leader, S.A.T. COM., Brooklyn North, under the direction
and supervision of Deputy Inspector James P. O'Connell, Commanding Officer, 77
Precinct, and Assistant Chief Joseph F.X. Cunneen, C.O., SATCOM Brooklyn North,
with the assistance of personnel from the S.A.T. COM., Brooklyn North
Investigations Unit.

37

3.    **PERSONS INVOLVED:**

A.    **Member of the Service-Subject**

Police Officer ***** *****, Shield # *****, Tax # *****
Command: 77 Pct.  Tour: 1730 X 0205
Assignment: 77 Anti-Crime

B.    **Member of the Service-Witness**

Police Officer ***** *****, Shield # *****, Tax # *****
Command: 77 Pct.  Tour: 1730 X 0205
Assignment: 77 Anti-Crime

C.    **Civilian Subject**

Martin Diggs, AKA: Martin Jones and Jesus Jones
NYSID # 6149438J, DOB: 11/27/72
487 Carlton Avenue also 47 Carlton Avenue, 1305 Loring Avenue

4.    **NARRATIVE:**

On Thursday, May 22, 2003, Officer's ***** and *****, both assigned to 77 Precinct Anti-Crime, were patrolling the area around Carlton Avenue and Dean Street, pursuant to a robbery pattern that was identified in the area. At approximately 0001 hours, a radio transmission of a suspicious male in the vicinity of 198 St. Mark's Avenue, Carlton Avenue to Vanderbilt Avenue, was received. Officer's ***** and ***** drove to St. Mark's Avenue where they encountered a male on the street. They identified themselves verbally as police officers and inquired as to what he was doing and if he saw anything unusual. He informed them that he had just left his residence. The male then continued on his way. Shortly thereafter, Officer ***** was driving north on Carlton Avenue from Bergen Street. He and Officer ***** then observed two males walking on the east side of the street. One of the men they recognized was the male they had spoken with minutes before. The lead male reached the stoop of a brownstone on Carlton Avenue south of Dean Street and entered onto the property. The following male continued towards the Brownstone where the first male had entered. It appeared to them that the following male was about to possibly rob the first male. As they approached the second male, he observed them and turned to continue north on Carlton Avenue. Officer ***** drove across Dean Street and stopped abreast of the male. After identifying themselves as police officers, they asked the male what he was doing. The male said to them that he had already explained his actions to them shortly before. He asked the male his address to which he responded either 64 or 46 Classon Avenue. They realized that that address was not anywhere near the vicinity of where they had originally encountered the male. With their suspicions heightened they exited the vehicle to approach the male. Officer ***** moved forward of a parked vehicle as Officer ***** passed to the rear. They both approached the male to

continue questioning him. As they approached, the male appeared to become defensive and backed away towards a nearby iron fence. As he was doing so he made repeated movements with his right hand towards his rear waistband. At that time the male said to them that he did not want to go back to jail. Officer *****, believing that the male was reaching for something, grabbed the male's right arm while Officer Garrito grabbed his left arm. While taking this action a firearm, a black Smith & Wesson .40 caliber semi-automatic fell to the ground from the rear waistband of the male. Officer ***** called out to Officer ***** "92" (their signal to each other indicating an immediate arrest). A struggle ensued, with the male now reaching towards his front waistband. As they attempted to handcuff the male, all three fell to the ground during the struggle. While Officer ***** was atop the male struggling with him, he heard more than one gunshot and felt the effect of the rapports. With that, he attempted to back off the male; and, in doing so, sees that his partner is also backing off the male. As the subject male also attempts to rise, Officer ***** heard two gunshots from his right where his partner was standing. Officer ***** then stated "I'm Hit...I'm Hit". Fearing for his partner's safety, Officer ***** moved Officer ***** to a place of safety behind a parked auto. He told Officer ***** to stay down as he moved towards the subject who was now attempting to stand and move north on Carlton Avenue. Officer ***** again approached the male as responding units began to arrive. Officer ***** backed off, identified himself and informed other officers that the male might have a second gun, and to look for it. Officer ***** then asked for gloves so that he could complete the handcuffing of the male. This because he observed that the thumb of the male had been severely injured during the encounter. All involved were then transported to the hospital for treatment. Officer ***** stated that he had not drawn his weapon nor did he see his partner draw his weapon as they approached the male or during that encounter.

Based upon the initial investigation it appears that during the struggle with the subject, Police Officer ***** retrieved the Smith&Wesson .40 Caliber semi-automatic from the ground and had it in his possession. During this engagement Officer ***** discharged this weapon seven (7) times at the perpetrator, striking him multiple times. Subsequent to his discharge he then placed the firearm on the ground, then was rendered medical aid.

5. **DETECTIVES:**

Sgt. John McArdle, 77 Squad, responded to the scene and supervised a canvass for witnesses to this incident. This canvass produced one (1) witness to the police discharge. Det. Lantino is the investigating member. Case # 1107.

6. **S.A.T. COM., B.N.I.U.:**

Lieutenant Mark McGovern along with Sergeants James E. Murray and, Robert O'Hare assigned to the Brooklyn North Investigations Unit, responded to the scene and conducted a canvass for witnesses to this incident. This canvass produced no additional witnesses to the firearm discharge.

7.    **DISTRICT ATTORNEY:**

Assistant District Attorney Tamara Edelstein, assigned to the Kings County District Attorney's Office, did not respond to the 77 Precinct; however, she conducted the interview of one witness to the discharge when that witness was transported to her office at her request.

8.    **M.O.S. STATEMENTS-SUBJECT:**

Police Officer ***** was not interviewed at this time at the request of the Kings County District Attorney's Office.

9.    **M.O.S. STATEMENT-WITNESSES:**

The following Uniformed Member of the Service was interviewed under the provisions of Patrol Guide Procedure 206-13. His statements were electronically recorded and will be maintained on file at the S.A.T. COM., Brooklyn North Investigations Unit under Call Out # 03-49. His statements assisted in developing the account of events contained in paragraph four (4).

P.O. ***** *****, tax # *****

Officer ***** stated, in sum and substance, that he was on plainclothes patrol with Officer *****. He was driving in the vicinity of Carlton Avenue due to robbery pattern that had been identified in the area. At approximately 2400 hours, a radio transmission of a suspicious male in the vicinity of 198 St. Mark's Avenue, Carlton Avenue to Vanderbilt Avenue, was received. He drove to St. Mark's Avenue and encountered a male on the street. They identified themselves verbally as police officers and inquired as to what he was doing. He informed them that he had just left his residence. The male then continued on his way. Shortly thereafter, Officer ***** was driving north on Carlton Avenue from Bergen Street. He and Officer ***** then observed two males walking one behind the other, on the eastside of the street. The lead male reached the stoop of a brownstone on Carlton Avenue south of Dean Street and entered onto the property. The following male continued towards where the first male had turned to climb the stairway of the brownstone. It appeared to Officer ***** that the following male was about to possibly rob the first male. However, as they approached, the second male observed them and turned to continue north on Carlton Avenue. Officer ***** drove across Dean Street and stopped abreast of the male. After identifying himself and his partner as police officers, he asked the male what he was doing. The male said to him that he had already explained his actions to them shortly before. He asked the male his address to which he responded either 64 or 46 Classon Avenue. Officer ***** realized that that address was not anywhere near the vicinity of where they had originally encountered the male. With their suspicions heightened, Officer ***** exited the vehicle as his partner also exited. Officer ***** moved forward of a parked vehicle as Officer ***** passed to the rear. They both

approached the male to continue questioning him. As they approached, the male appeared to become defensive and backed away towards a nearby fence. As he was doing so he made movements with his hand towards his rear waistband. At that time the male said to them that he did not want to go back to jail. Officer *****, believing that the male was reaching for something, grabbed the male's right arm. Suddenly, what appeared to be a firearm fell to the ground from the rear waistband of the male. Officer ***** called out to Officer ***** "92", their signal for an immediate arrest. A struggle ensued with the male now reaching towards his front waistband. All three fell to the ground during the struggle. While Officer ***** was atop the male struggling with him, he hears more than one gunshot and felt the effect of the discharges. With that, he attempted to back off the male; and, in doing so, sees that his partner is also backing off the male. As the subject male also attempts to rise, Officer ***** heard two gunshots from his right where his partner was standing. Fearing for his partner's safety, Officer ***** moves Officer ***** to a place of safety behind a parked auto. He told Officer ***** to stay down as he moved towards the subject who was now attempting to stand and move north on Carlton Avenue. Officer ***** again engaged the male as responding units began to arrive. Officer ***** backed off, identified himself and informed other officers that the male might have a second gun, and to look for it. Officer ***** then asked for gloves so that he could complete the handcuffing of the male. This because he observed that the thumb of the male had been damaged during the encounter. All involved were then transported to the hospital for treatment. Officer ***** stated that he had not drawn his weapon nor did he see his partner draw his weapon as they approached the male or during that encounter.

10.    **CIVILIAN SUBJECT INTERVIEWS-PERPETRATOR:**

The subject was not interviewed.

11.    **CIVILIAN WITNESS INTERVIEWS:**

There is one (1) witness to this incident. His identity and statement is on file with the 77 Precinct Detective Squad.

The male witness stated that he was standing on the front steps of his residence when he observed the subject, a male, Black, walking north on Carlton Avenue, on the eastside. He heard that male say out loud, "Why they acting like they never seen someone like me." At that time, he observed an unmarked police car driving behind the subject. When the vehicle was just past Dean Street the occupants of the vehicle exited and approached the subject. They backed the subject against the wall whereupon the subject stated, "What's going on." One of the officers grabbed the subject by the neck and tried to take him to the ground. The second officer assisted the first. All three wound up on the ground with the officers saying, "Give me your hands." The subject stated, "I don't want to go back to jail." This exchange occurred three times. The officers continued to struggle with the subject when there was a

single shot. The subject got up and ran between the fence and the trees. One officer started firing 6-7 shots at the male who then fell to the ground. One of the officers then went to the other who had collapsed to the ground. One of the officers picked up a gun then put it down.

12.   **PERPETRATORS HISTORY:**

Martin Diggs, M/B/30, DOB: 11/27/71, NYSID # 6149438J
06/08/88 – Robbery – 84 Pct.
07/09/88 – Robbery – MTS Pct.
07/1788  - Gr. Larc. – 88 Pct.
08/19/88 – Robbery – 88 Pct.
05/22/89 – CPW – 88 Pct.
09/13/89 – G.L.A. – 101 Pct.
11/29/89 - Robbery – 84 Pct.
10/20/93 – CPCS – 75 Pct.
01/21/94 – CPW – 75 Pct.
04/10/94 – CPW – 77 Pct.
05/23/96 – CPW – 75 Pct.
09/13/02 – CSCS – 88 Pct

09/22/95 – C.P. Marijuana – No. Carolina
03/03/00 – C. P. Firearm – No. Carolina

13.   **M.O.S. DESCRIPTIONS:**

Police Officer *****, M/H/26
On Duty in plainclothes – Officer was wearing the Color of the Day - White
The officer was wearing Department authorized body armor.
Appointment: 7/16/99, Assigned: 2/23/00

14.   **M.O.S. FIREARMS DISCRIPTION:**

A.  Sgt. Sharkey, Tax # 918320, 77 Pct., inspected Officer *****'s firearm.
B.  It is a Glock, 9mm, Model 19, S/N CTL617US
C.  It contained fifteen (15) rounds of Department authorized ammunition in its magazine and one (1) round of Department authorized ammunition in the chamber.
D.  Two additional magazines carried by Officer ***** were inspected and found to each contain fifteen (15) rounds of Department authorized ammunition.
E.  Sgt. Murray, B.N.I.U., verified the weapon as being listed on the subjects Force Record Card.
F.  The weapon was carried in an authorized holster.

G. Officer *****'s service weapon was not secured. The subject's weapon, which was used by Officer *****, will be transported to the Firearms Analysis Unit by Crime Scene Unit personnel for testing.

H. Officer Carrido was not carrying any additional firearm.

15. **M.O.S. HISTORICAL DATA:**

Not available at this time. The information will be supplied in the follow-up report of this investigation.

16. **CRIME SCENE UNIT:**

A. Sgt. Blozis, Shield #2033, Det. Wright, shield #6375 and Det. Henry, shield# 5153, and Det. Wallace, shield#3261 C.S.U., responded under run # 03-650.

B. Evidence recovered:

**a.** One (1) 9mm Ruger P-85, serial # 30189830 with one bullet hole with bullet lodged in upper backstrap.

**b.** One (1) Smith&Wesson .40 cal model # SW40C, serial # PAK8956 containing one chambered live cartridge.

**c.** Seven (7) discharged .40 caliber shells, S&W COR-BON Brass case with white primer

**d.** Two (2) 9mm Luger PMC brass case white primer discharged shells

**e.** One (1) biological sample and control sample recovered from firearm

**f.** Two (2) fibers removed from perp's firearm

**g.** One (1) piece deformed copper-jacket lead bullet recovered from bullet-resistant vest of P.O. Garrito

**h.** Suspects clothing

**i.** Point-Blank bullet-resistant vest, serial# 9900371483, lot# 0898A.

C. A sketch of the scene was prepared by Det. Wright.

D. The service weapons of both Officer Garrito and Officer ***** were examined. The weapons contained authorized department ammunition.

17. **EMERGENCY SERVICES UNIT:**

A. P.O. Condon and P.O. Formica, Truck # 8A responded and conducted a search of the crime scene.

B. Capt. Johnson, SATCOM Duty Captain, supervised the search.

C. The search resulted in the recovery of ballistic evidence.

D. Sergeant Merluin, 77 Precinct supervised a daylight search conducted by Emergency Service Unit with no additional evidence recovered.

43

18.    **FIREARMS ANALYSIS UNIT:**

    A.   P.O. Fitzgerald, F.A.U., was notified

    B.   Officer *****'s service firearm will not be delivered to F.A.U. by B.N.I.U.

19.    **TRAUMA UNIT:**

    A.   Lt. Matili, Medical Division, was notified.

    B.   Officer ***** and Officer ***** were advised of the availability of counseling services both through this department and their line organization.

    C.   The Trauma Response Unit did not respond to the 77 Precinct.

20.    **BOROUGH ASSIGNMENT:**

Officer ***** will be assigned to administrative duties at SATCOM Brooklyn North Operations for a minimum of his next three tours.

21.    **COMMUNITY AFFAIRS:**

Sgt. Sharkey, 77 Precinct, conducted a canvass of the area and found no community unrest as a result of this incident.

22.    **REPORTS PREPARED:**

| | | |
|---|---|---|
| OLCS # | 64070 | Assault 1 |
| OLCS # | 64071 | Assault 2 |
| OLCS # | 64072 | Investigate Shots Fired |
| Voucher # | L856501 | Ballistics |
| Voucher # | L856502 | Clothing |
| Voucher # | L856503 | Clothing |
| Voucher # | L856504 | Gun |
| Voucher # | L856505 | Narcotics |
| OLBS # | K03636276 | |

23.    **MEDICAL INFORMATION:**

    A.   P.O. ***** was removed to Kings County Hospital for treatment of gunshot injuries and blunt trauma. Treated by Dr. Kurtz and admitted in stable condition.

P.O.***** was transported to Kings County Hospital for treatment of non-gunshot injuries to his hands. He was treated and released by Dr. Kurtz.

44

B.   N/A

C.   Martin Diggs was removed by EMS to Brookdale Hospital where he was treated for gunshot wounds by Dr. Wadrendpy and admitted in critical condition.

24.   **RADIO RUN INFORMATION:**

Sgt. O'Hare, B.N.I.U., prepared a request for taped copies of all 911 and radio transmissions relative to this incident. SPRINT # X00137, X00168, and X00170. These radio transmissions were reviewed for content and substance, and correlate to the events as described by the involved officers.

25.   **MISCELLANEOUS:**

The following weapons were recovered from the scene:

S&W, .40 caliber, Model 40 C semi-automatic pistol, S/N PAK8956.
The weapon, upon inspection, contained one (1) round in the chamber and none in the magazine. The weapon is capable of the following load: one (1) in the chamber and ten (10) in the magazine.

Ruger, 9mm, Model P-85, semi-automatic pistol, S/N 30189830.
At this time, it has been deemed unsafe to inspect this weapon for its state of load, due to its being struck by a round in the grip. It will be delivered intact to the Firearms Analysis Unit for further analysis.

Officer ***** was directed to contact the Outdoor Range and arrange to attend the next Firearms Tactics Review session.

P.O. ***** sustained blunt trauma to his chest, the bullet having penetrated three layers of his vest, and a gunshot injury to his right foot causing a fracture. As of the writing of this report, the bullet lodged in the foot of Officer ***** has not been removed.

P.O. ***** sustained swelling and abrasions to both his hands. Additional medical tests are scheduled to determine if PO ***** suffered a fractured right hand.

Martin Diggs, subject, sustained gunshot wounds to his right rear leg, his right rear flank, his right thumb and right foot. There was an additional bullet wound to the stomach area of Martin Diggs, however, as per Dr. Wadrendpy it cannot be determined if this wound was sustained during this incident or on a previous date.

A search of Martin Diggs' vouchered clothing by Crime Scene Unit personnel revealed 2 small bags of marijuana beneath the clothing, 1 plastic bag containing 22 smaller bags of marijuana recovered from his jacket, and one additional bag containing a quantity of alleged   marijuana in his jacket pocket.

Captain Monahan inspected the weapons and additional magazines of both Officer ***** and Officer *****. All weapons were found to be properly loaded with authorized ammunition. Additionally, due to the unusual nature of the events in this firearms discharge, the weapons of all responding officers were examined for evidence of recent discharge with negative results.

26.    **NOTIFIED:**

| | |
|---|---|
| Sgt. Accurso | D.C.P.I. |
| Det. Hogan | I.A.B., Log # 03/11987 |
| P.O. Stagnitta | Operations, FD# 45 |
| P.O. Cornetta | SATCOM Wheel, Log# 1009 |

27.    **PRESENT:**

| | |
|---|---|
| Hon. Michael Bloomberg | Mayor |
| Hon. Raymond W. Kelly | Police Commissioner |
| Dep. Comm. Michael O'Looney | D.C.P.I. |
| Chief Joseph J. Espositio | Chief of Department |
| Chief Nicholas Estavillo | Chief of Patrol |
| A.C. Joseph F.X. Cunneen | C.O., SATCOM B. N. |
| D.C. Albert W. Girimonte | X.O., SATCOM B. N. |
| D.C. Joellen F. Kunkel | Duty Chief |
| D.C. Michael O'Neil | C.O. Employee Relations |
| Insp. Steven Silks | C.O., F.A.U. |
| Insp. Coan | D.C.P.I. |
| Insp. Michael Gabriel | SATCOM B.N., Det. Ops. |
| Insp. Denis McCarthy | C.O., F.I.D. |
| Insp. James T. O'Brien | SATCOM Counter Terrorism |
| D.I. James O'Connell | C.O., 77 Precinct |
| D.I. Edward Mullen | PBBS Duty Inspector |
| D.I. Michael Muscatello | Duty Inspector |
| D.I. Brian O'Neil | I.A.B., Group 9 |
| Capt. Timothy J. Trainor | C.O., SATCOM B.N.I.U. |
| Capt. Kristel A. Johnson | Duty Captain |
| Capt. Patrick McAndrews | SATCOM B.N. |
| Capt. Gary Gomula | C.O., Crime Scene Unit |
| Capt. Ignatius LaBarbera | SATCOM B.N. |
| Capt. John Corbisiero | X.O., 90 Precinct |
| Capt. Christopher Monahan | X.O., 75 Precinct |
| Capt. James Klein | C.O., D.C.P.I. |
| Capt. Charles P. Neacy | SATCOM B.N. Det. Ops. |
| Capt. Casto Zona | SATCOM B.N. Det. Ops. |

Capt. Paullick                          PBBS Duty Captain
Capt. Novak                             X.O., 71 Precinct
Capt. Probeck                           P.B.B.S.
Lt. Joseph Alagna                       Chief of Department
Lt. John Lewis                          67 Precinct
Lt. Thomas Reiley                       Brooklyn Robbery
Lt. Thomas Panetta                      Group 54
Sgt. Sharkey                            77 Anti-Crime
Sgt. DeCandia                           E.S.U. Citywide Supv.
P.O. Patrick Lynch                      P.B.A.
Pat Lanza                               Mayor's Office

28.  **RECOMMENDATION:**

The investigation of this incident is ongoing pending the outcome of Officer *****'s interview under P.G. 206-13. However, based upon the preliminary investigation conducted by the undersigned it is believed that Officer ***** gained control of the S&W .40 caliber pistol originally possessed by the subject which had fallen from his rear waistband, and used that weapon to stem the attack of the subject upon him.

Timothy J. Trainor
Captain

**DISTRIBUTION:**
Deputy Commissioner Strategic Initiatives
Chief of Department
Chief of Department Firearms Discharge Review Board (2 Copies)
Chief of Patrol
Chief of I.A.B.
Chief of Personnel
C.O., SATCOM Brooklyn North
C.O., SATCOM Brooklyn North Patrol Operations
C.O., I.A.B.
C.O., D.C.P.I.
C.O., F.I.D.
C.O., Firearms and Tactics Section
C.O., Medical Division
C.O., Personnel Safety Desk
C.O., 77 Precinct
C.O., SATCOM BNIU

**ATTACHMENTS:**
SPRINT Report
Crime Scene Sketch

47

Exhibit K

**PRESS RELEASE**

NO. 2007-022
Friday, June 18, 2007

### COMMISSIONER KELLY ANNOUNCES UNDERCOVER PANEL RECOMMENDATIONS: MANDATORY ALCOHOL TESTING IN SHOOTINGS WITH FATALITIES OR INJURIES

Police Commissioner Raymond W. Kelly announced today 19 recommendations of a special panel that he appointed to review New York City Police Department undercover procedures in the wake of the Sean Bell shooting.

The recommendations include mandatory breathalyzer tests of all police officers, on duty or off duty, whose firearm discharge results in injury or death. They also include recommendations to improve how undercover officers are recruited, trained, supervised, and retained.

Commissioner Kelly notified the Department's executive command staff of the recommendations today and directed them to devise implementation plans or to identify any challenges or barriers to implementation.

It is anticipated that the administration of breathalyzer tests will begin in September.

"I want to thank the members of the committee for all of the time they donated to this important undertaking. It has resulted in a comprehensive set of thoughtful recommendations to make police undercover operations safer, more effective, and better understood by the public, while improving recruitment, training, supervision, retention and accountability," Commissioner Kelly said.

"There is no more dangerous assignment in policing than undercover work," Commissioner Kelly said. "We're indebted to the committee for making it possible for the Police Department to go forward better prepared to make undercover operations the safest possible for the police and public alike."

The Deputy Commissioner, Legal Matters, has addressed the legal issues involved in implementing the proposed alcohol testing policy and has concluded that such a policy would be constitutional. While there is a currently pending court case involving the Department's authority to use hair samples to test for drug usage, the DCLM has concluded that the proposed new alcohol testing policy does not have to be collectively bargained, and, in addition, members should be trained and coached on methods of limiting and avoiding alcohol consumption during undercover operations.

The committee will continue to meet to address any other issues that may arise as implementation moves forward.

The Committee for the Review of Undercover Procedures is chaired by Chief of Internal Affairs Charles Campisi. The other members include: Deputy Commissioner Dr. Cedric Alexander of the New York State Division of Criminal Justice Services; Deputy Commissioner of Training Charles DeRienzo; Deputy Commissioner of Legal Matters Commissioner S. Andrew Schaffer; Deputy Commissioner of Strategic Initiatives Michael J. Farrell; Deputy Commissioner of Intelligence David Cohen; Chief of Personnel Rafael Pinero; Chief of Community Affairs Douglas Ziegler; and Chief of Organized Crime Control Anthony Izzo.

Recommendations:

1    Develop methods for the psychological screening of candidates for undercover assignments

2    Provide periodic psychological screening and counseling for active undercover officers whose assignments are the most stressful in the Department and provide training for managing stress

3    Enhance scenario based training for undercovers through the use of professional actors

4    Expand the pool of potential undercovers by accepting particularly suitable candidates with less than 2 years of service and provide training tailored to their needs

5    Develop specific training for supervisors who oversee undercover operations with an emphasis on management, leadership, communication and interpersonal skills

6    Conduct a formal job analysis of the undercover assignments in order to establish a more effective performance evaluation system

7    Develop a community outreach program that educates the public about the risks, challenges and necessity of undercover operations

8    Develop a training video for officers involved in undercover operations which includes the perspectives of community leaders from the areas where operations are most often undertaken

9    Require tactical plans for undercover operations to include relevant information about the neighborhood in which the operation will take place

10  Require the administration of a Breathalyzer test in all cases in which a member of the service is involved in a firearms discharge incident, on duty or off duty, which results in injury or death

11  Clarify Department procedures regarding the consumption of alcohol by undercover officers during operations to limit such consumption to two drinks per tour and provide training on credible ways to avoid drinking altogether when pressured to do so by subjects

12  Develop a management accountability mechanism tailored to access the performance of supervisors who oversee undercover operations

13  Require the Investigations Units of the relevant Bureaus to conduct periodic inspections of tactical meetings to assess their adequacy and completeness

14  Establish a mechanism for assuring the completion of required annual firearms training by undercover officers, while assuring the security of their identities

15  Design a standard, readily identifiable, highly reflective jacket for officers use when involved in plainclothes operations

16  Provide supervisors of undercover operations with portable megaphones and install light packages and public address systems in unmarked Department vehicles so as to enhance the awareness of police presence during enforcement actions

17  Require the inspection of all members of undercover operations, prior to deployment, to assure that all required equipment is being carried and is in good working order

18  Modify the tactical plan template to include specific consideration of the placement of marked police vehicles near the set to be deployed as needed, depending on the characteristics of the site

19  Develop incentives to retain experienced and highly competent undercover officers

07 Civ. 10359 (GBD)(MHD)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN F. DRISCOLL, as President of the Captain's
Endowment Association, Inc., et al.,

Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

## DEFENDANTS' NOTICE OF CROSS-MOTION

**MICHAEL A. CARDOZO**
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-187
New York, N.Y. 10007-2601

Of Counsel: Alan M. Schlesinger
Tel: (212) 788-0952

Matter No. 2007-037940

*Due and timely service is hereby admitted.*

New York, N.Y. ....................., 200 . . .

.......................................................

Attorney for.........................................