07 Civ. 10359 (GBD)(MHD)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN F. DRISCOLL, as President of the Captains
Endowment Association, Inc., and the CAPTAINS
ENDOWMENT ASSOCIATION, INC.,

Plaintiffs,

-against-

CITY OF NEW YORK, the NEW YORK CITY POLICE
DEPARTMENT, and RAYMOND W. KELLY, as
Commissioner of the New York City Police Department,

Defendants

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' CROSS-MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
Attorney for Defendants
100 Church Street, Room 2-187
New York, NY 10007-2601
Tel: 212-788-0952

**ALAN M. SCHLESINGER,**
Of Counsel

Matter No.: 2007-037940

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 3

ARGUMENT ..................................................................................................................... 6

    POINT I ...................................................................................................................... 6

    THE COMPLAINT FAILS TO STATE A CLAIM
    AND MUST BE DISMISSED. .................................................................... 6

    POINT II ................................................................................................................... 19

    THE DUE PROCESS CLAUSE CLAIMS MUST
    BE DISMISSED. ..................................................................................... 19

        A.   Substantive Due Process ................................................................... 19

        B.   Procedural Due Process..................................................................... 20

    POINT III .................................................................................................................. 22

    THE PRELIMINARY INJUNCTION MUST BE
    DENIED.................................................................................................. 22

CONCLUSION.................................................................................................................. 25

## PRELIMINARY STATEMENT[1]

Plaintiffs bring this complaint challenging NYPD Interim Order 52 ("IO 52"), which requires that a breathalyzer test be administered to any NYPD officer who is involved in a shooting that results in injury or death to a person in New York City.  Plaintiffs contend that the breathalyzer is an unconstitutional search and that IO 52 is unconstitutional because it violates substantive and procedural due process.   Plaintiffs move for a preliminary injunction prohibiting enforcement of IO 52.

Defendants now move to dismiss the Complaint, or in the alternative for summary judgment, and oppose the motion for a preliminary injunction.  IO 52 requires that a breathalyzer test be administered under certain narrowly defined circumstances; there must be shooting off the range, in New York City, that injures a person.  This regulation falls squarely within the "special needs" doctrine of the Fourth Amendment and is therefore constitutional.  The search is not primarily for purposes of a criminal investigation but to fulfill the NYPD's compelling interest in the integrity of police shootings.  NYPD officers have been invested with the power to apply deadly force in the course of their duties and the NYPD has a public duty to circumscribe and monitor the use of this enormous authority. The NYPD also has a duty to the public and to other officers to assure that NYPD officers

---

[1] IO52 is challenged in two other cases: (1) by the Detectives Endowment Association, the Sergeants' Benevolent Association and the Lieutenants Benevolent Association, ("DEA" "SBA" and "LBA") unions representing NYPD officers in the ranks of Detective, Sergeant, and Lieutenant in Palladino v. City of New York, 07 Civ. 9246 (GBD)(MGD); and (2) by the Patrolmen's Benevolent Association ("PBA") which represents NYPD in the title of Police Officer in Lynch v. City of New York, 07 Civ. 9337 (GBD)(MGD).  Defendants are the same in all three cases, the City of New York ("City"), the City's Police Department ("NYPD"), and the Police Commissioner.  All three of these lawsuits contend that IO 52 violates the Fourth and Fourteenth Amendments; Palladino, adds a "void for vagueness" claim, and the instant case adds Due Process Clause claims.  Defendants therefore requests that if the complaints in these three cases survive defendants' motions to dismiss, then all  three cases be consolidated for all purposes.

are not engaging in deadly force while intoxicated.  IO 52 will also deter the use of alcohol on duty and immediately prior to the officer going on duty as well as handling their weapons while off duty.  These important, non-criminal needs are compelling and are all served by the breathalyzer test required by IO 52.

In applying a balancing test required by the special needs doctrine, the breathalyzer test represents a minimal invasion of the already very limited privacy rights of officers.  NYPD officers are subject to random drug testing and are required to be fit for duty in all but narrow circumstances.  They are required to safeguard their weapon whenever they may be in a position where alcohol may be consumed.  Moreover, every firearms discharge is subject to rigorous investigation and multiple reviews.  The breathalyzer is minimally intrusive, takes about 5 minutes, and IO 52 requires that the test be performed under circumstances that are sensitive to the privacy of the officer.  The test is automatic if the criteria in IO 52 are met and this is a bulwark against arbitrary and discriminatory actions.  The mandatory nature of the test also serves the purpose of removing any possible stigma that might otherwise adhere to the administration of a breathalyzer test.

NYPD officers are invested by the government with the awesome power of carrying and using deadly weapons.  The government has a responsibility to do all it can to make sure that this awesome authority is used wisely and well.  Further, the information captured by the breathalyzer dissipates quickly and cannot be captured in any other way.  In short, in the very narrow circumstances of the instant case, and in view of the awesome authority exercised by officers, the concomitant lessening of their already limited privacy interests especially when they have taken positive action to exercise that awesome authority, and the needs of the public and other officers, the breathalyzer test under IO 52 is reasonable

under the Fourth Amendment.  This is an end to plaintiffs' claim of unconstitutionality and the Complaint must be dismissed.

In the event that some part of the Complaint survives defendants' motion to dismiss, or in the alternative for summary judgment, plaintiffs' motion for a preliminary injunction must be denied.  There is no likelihood of success on the merits of the Complaint and thus, the test for a preliminary injunction has simply not been met.

## STATEMENT OF FACTS[2]

The NYPD is an agency of the City of New York ("City") charged with the protection of the public's safety, health, and property.  In view of this authority, officers of all ranks in the NYPD are required to carry guns and to use deadly force in certain circumstances in the course of their duties.  In recent years there have been between 110 and 130 firearms discharges by NYPD officers each year.  When an NYPD officer discharges his gun, that use is thoroughly and laboriously investigated and reviewed by the NYPD.  There will be an initial report by a Shooting Team Leader which will include information concerning the officers involved, the results of a canvass for witness to the shooting, results of the activity of the Crime Scene Unit, a record of the NYPD notice to the District Attorneys' office and their response, a narrative of the results of the preliminary investigation and recommendations for training, discipline or in rare cases criminal investigation.  The shooting will be reviewed by the Borough Firearms Advisory Board and thereafter by the NYPD's Firearms Discharge Review Board, a citywide board consisting of a variety of

---

[2]For a more detailed statement of facts the Court is respectfully referred to the Declaration Charles V. Campisi, dated November 7, 2007, and the exhibits annexed thereto, and to the Declaration of Suzanne Gimblet, dated November 6, 2007, which are annexed to the Declaration of Alan M. Schlesinger, dated December 7, 2007.  All references to exhibits are to the exhibits annexed to the Campisi Declaration.

Chiefs and Deputy Commissioners of the NYPD.

IO 52, which was issued September 30, 2007, requires that a breathalyzer test be administered whenever an NYPD officer is involved in a shooting that causes injury or death to a person in New York City. IO 52 does not require that a warrant be issued or that there be individualized reasonable suspicion to support the breathalyzer test. The breathalyzer measures alcohol in the body and this information will be lost if the test is not performed quickly.

The NYPD does not guarantee that the test will not also be used in a criminal investigation but IO 52 is applicable whenever there is a shooting resulting in injury to a person regardless of whether a criminal investigation ensues. For example, if an officer accidentally shoots him or herself in New York City, there may be little or no risk of criminal prosecution but IO 52 will be invoked in that situation. This is not a mere hypothetical but has already occurred in the month since IO 52 became effective.

Prior to the issuance of IO 52, NYPD officers were already subject to a variety of restrictions. They were required to submit to drug tests when they enter the NYPD and during their probationary period. NYPD officers are randomly drug tested throughout their NYPD career. In addition, NYPD officers are required to be fit for duty at all times and drug and breathalyzer tests can be ordered for NYPD officers who appear unfit for duty. Campisi Decl. ¶¶ 5 and 6; PG 203-04, Exhibit "B." If an officer believes that he or she may be in a position where alcohol is consumed it is the responsibility of that officer to safeguard the officer's weapon so that the officer is not in possession of a weapon while intoxicated. The NYPD has published a regulation devoted just to the removal of firearms of officers that are unfit for duty due to alcohol consumption.

The NYPD has long had a Counseling Unit which is devoted solely to addressing the alcohol problems of NYPD officers.  Officers who appear to have an alcohol problem can be ordered to attend an interview at the Counseling Unit and officers can go to that unit on their own.  From 2005-07 the Counseling Unit conducted 380 new interviews of officers, that is, interviews of officers not previously seen by the Counseling Unit.   There are 35,000 NYPD officers and the number newly seen by the Counseling Unit therefore represents over 1% of all NYPD officers.

Despite these efforts the NYPD has experienced serious alcohol related problems.  There have been 6 suicides from 2005 to present and of these 4 were under circumstances indicating alcohol use.  There have been repeated arrests of officers for driving while intoxicated ("DWI").  In 2005, 10 off duty officers were arrested for alleged DWI.  In 2006, 16 off duty officers were arrested for DWI.  This year, to date, 12 NYPD off duty officers were arrested for alleged DWI.  Thus, NYPD officers have engaged in illegal and life threatening conduct in connection with alcohol use.

In November, 2006, undercover officers of the NYPD engaged in an on duty shooting that resulted in the death of Sean Bell and the wounding of two companions.  Three officers have been indicted in connection with this tragic incident.  Rumors circulated that an officer involved had been drinking at a club just prior to the shooting.  In the wake of the Sean Bell shooting, the Police Commissioner appointed a high level committee to review undercover operations.   The committee, chaired by Chief Charles V. Campisi, who has served for more than a decade as Chief of the NYPD's Internal Affairs Bureau ("IAB"), produced 19 recommendations which were announced in June, 2007.  This was prior to the completion of a final report so as not to delay the implementation of the recommendations.

Number 10 of the 19 recommendations was the administration of breathalyzer tests at shootings. A breathalyzer measures alcohol in air exhaled by the individual officer and this information will be lost if the test is not performed soon after the shooting. This recommendation led to the promulgation of IO 52, which requires that a breathalyzer test be administered to any officer involved in a firearm discharge, off the range, in New York City which causes injury to a person. IO 52 uses a cut-off of .08 for the breathalyzer test, which is the limit used in the New York Vehicle and Traffic Law ("VTL").

IO 52 serves the NYPD's interest in maintaining the integrity of police use of firearms. The awesome power to use deadly force must be monitored and circumscribed by the NYPD. The NYPD has a right to ensure that this awesome power is not abused due to alcohol consumption. IO 52 will also help assure the public and fellow officers that officers are not discharging their firearms while under the influence of alcohol. This will maintain public confidence in the NYPD, which is essential to its mission of serving and protecting the public. IO 52 will also deter officers from using alcohol on duty or immediately prior to a tour of duty.

## ARGUMENT

### POINT I

### THE COMPLAINT FAILS TO STATE A CLAIM AND MUST BE DISMISSED.

The Fourth Amendment to the Constitution prohibits "unreasonable searches and seizures." U.S. Const. Fourth Amend. It is by now well-established that the "special needs" doctrine of the Fourth Amendment permits searches without a warrant and without individualized suspicion. See Cassidy v. Chertoff, 471 F.3d 67, 74-75 (2d Cir. 2006) (reviewing cases); see also Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656

(1989); <u>Skinner v. Ry. Labor Executives' Ass'n</u>, 489 U.S. 602 (1989); <u>MacWade v. Kelly</u>, 460 F.3d 260 (2d Cir. 2006). The special need must be a need beyond a general need of ordinary law enforcement although law enforcement may be an additional, or secondary beneficiary, of the special needs search. <u>See</u>, <u>e.g.</u>, <u>Illinois v. Lidster</u>, 540 U.S. 419 (2004)(upholding highway checkpoint stops erected to seek information from public); <u>Skinner</u>, 489 U.S. at 620-21, and n. 5; <u>MacWade</u>, 460 F.3d at 264, (random, unpredictable subway searches upheld against Fourth Amendment challenge; primary purpose is to deter terrorists and secondary purpose is to uncover such an attempt); <u>United States v. Edwards</u>, 498 F.2d 496, 500-01 (2d Cir. 1974)(purpose of airport search is deterring hijacking).

The application of the special needs doctrine under the Fourth Amendment necessarily requires a context-specific inquiry. <u>Cassidy</u>, 471 F.3d at 75. It requires that the privacy interests which are protected by the Fourth Amendment be balanced against the public interests advanced by the search. <u>Id.</u>; <u>see</u> <u>Von Raab</u>, 489 U.S. at 665-66. The Second Circuit has established a three-pronged test to be used in conducting this balancing:

> (1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs.

<u>Id.</u>

Turning to the first prong of the special needs test, NYPD officers are perhaps the most import public safety agents of the government. They have been invested with enormous powers, to make arrests depriving a citizen of his or her liberty, and to use deadly force, depriving a citizen of life. Consequently, NYPD officers have diminished expectations of privacy. Simply put, a police officer is not like other employees of the government. The importance of the police in society cannot be overestimated.

The rights of officers are circumscribed by the needs of the profession which the officer has chosen.  For example, the Supreme Court has approved the regulation of the grooming of police officers.  <u>Kelley v. Johnson</u>, 425 U.S. 238 (1978)(noting that police offices are subject to restraints that would be unconstitutional if applied to other government employees).  <u>Kelley</u> recognizes that police departments acting as employers have broader discretion in the direction of their employees than would be permitted in the general regulation of society.

Here, too, in requiring the breathalyzer test at issue the NYPD acts as employer and not just simply as a criminal investigation agency.  In <u>Von Raab</u>, the Supreme Court in evaluating a urine test held that Customs officials have a diminished expectation of privacy by virtue of the fact that they carry guns.  489 U.S. at 671("We think Customs employees … who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in respect to the intrusions occasioned by a urine test.").  The same is true of NYPD officers here, although the intrusion of a breathalyzer is less than that of the urine test approved in <u>Von Raab</u>.

New York's courts have long recognized that police discipline requires special sensitivity.  Unlike the system for disciplining civilian employees, police discipline is a matter left to the discretion of the Police Commissioner and is not subject to the normal constraints of the disciplinary process established for civilian employees.  <u>Compare</u> N.Y.C. Admin. Code §§ 14-114, <u>et</u> <u>seq.</u>, <u>with</u> N.Y. Civil Service Law § 75; <u>Montella v. Bratton</u>, 93 N.Y.2d 424, 691 N.Y.S.2d 372, 713 N.E.2d 406 (1999); <u>Pell v. Board of Education</u>, 34 N.Y.2d 222, 56 N.Y.S.2d 833, 313 N.E.2d 321 (1974)(distinguishing the discretion afforded heads of civilian agencies from those of the heads of police agencies).  The discretion accorded

the Police Commissioner in imposing discipline on the members of the police service has been exceptionally broad under New York law.  See Trotta v. Ward, 77 N.Y.2d 827, 828, 566 N.Y.S.2d 199, 567 N.E.2d 241 (1991); Lynch v. Giuliani, 301 A.D.2d 351, 359, 755 N.Y.S.2d 6, 14 (1st Dep't 2003) )("The Commissioner's powers over police discipline arise out of the fact that it is he or she 'and not the courts, [who] is accountable to the public for the integrity of the Department'")(citations omitted).

NYPD officers are subject to multiple physical limitations as well.  Matter of Caruso v. Ward, 72 N.Y.2d 432, 439, 534 N.Y.S.2d 142, 530 N.E.2d 850 (1988)(upholding random drug testing in NYPD's OCCB).  An NYPD officer is required to be fit for duty at all times except for certain specified occasions.  Campisi Decl. ¶¶ 5 and 6; PG 203-04, Exhibit "B.".  The officer is also required to avoid drinking to the extent that the officer becomes intoxicated even while off duty.  Id.  If the officer believes that he or she may be drinking alcohol the officer is required to take precautions to safeguard his or her weapon to ensure that they do not carry a firearm while intoxicated.  Id.

Drug testing is a constant companion for the NYPD officer.  Upon entering the City's police force, the new officer is required to take a drug test.  Campisi Decl. ¶ 14. During the officer's probationary period the officer will again be drug tested.  Id.  As noted above, an NYPD officer applying to special commands, such as the NYPD's Organized Crime Control Bureau ("OCCB"), must pass a drug test as part of the application.  Id. ¶ 15. Additionally, throughout their careers, NYPD officers are subject to a program of random drug tests in which tests are done without warrant or individualized suspicion.  Id. ¶ 17.

Moreover, nowhere is the expectation of privacy lower than at the scene of a firearm discharge by a NYPD officer.  In recent years, there have been between 110 and 130

firearms discharges by NYPD officers each year and the NYPD has elaborate and detailed procedures for addressing each such a shooting incident. Campisi Decl. ¶ 25. Each firearm discharge, whether on or off duty, that is not on the range is investigated by a "Shooting Team Leader," who holds the rank of Captain or above. Campisi Decl. ¶¶ 26, et seq.; Civilian witnesses are sought out and asked for their accounts of the shooting. Officers will be asked for statements. The weapons and ammunition of the officers will be examined. A crime scene unit may respond as may an officer from the NYPD's Internal Affairs Bureau ("IAB"). The District Attorney's office will be notified and may, in their discretion, send personnel to the scene. Community affairs officers will also be present to determine whether the shooting will require extensive dialogue with the community to explain the actions of the NYPD's officer and to gauge community reaction. The Patrol Borough will also respond with superior officers. Each firearm discharge results in detailed reports; an initial report prepared soon after the shooting and a later final report. The initial report is extremely detailed and may indicate whether the shooting was within NYPD guidelines and whether there should be re-training or discipline of the employee. See Campisi Decl. ¶ 25, et seq.; a sample initial report Exhibit "J." The initial report may also indicate whether there is a criminal investigation arising from the incident.

The firearms discharge will be reviewed at the borough level by the Borough Firearms Discharge Advisory Board and at the Citywide level by the Firearms Discharge Review Board. The Firearms Discharge Review Board is a very high level board chaired by the Chief of Department, and includes representatives of the Deputy Commissioner for Training, the Deputy Commissioner for Legal Matters, Chief of Personnel, an Operational Bureau Chief and the Commanding Officer of the Firearms and Tactics Section. Each

firearms discharge is subject to intense scrutiny and high level review and where criminal activity is suspected there is additional review by IAB and the District Attorney.

These elaborate procedures and investigative techniques prove beyond question that shootings are rigorously investigated by the NYPD and that the limited privacy rights of NYPD officers reach their nadir at the scene of a police shooting. Cf. California v. Charney, 471 U.S. 386, 392 (1985)(complex regulatory scheme diminishes expectations of privacy). In this case, plaintiffs challenge IO 52's requirement of a breathalyzer tests occurring after a shooting has caused injury, while NYPD officers are subject to random drug tests, without a triggering event such as shooting, and without a warrant, or individualized suspicion. Thus, the privacy expectations of those who serve the public in their police force are, as can be readily seen, highly diminished. Moreover, these very limited privacy interests of the officer involved in a shooting which injures a person are safeguarded to the extent consistent with both the breathalyzer test and the need to perform that test as soon as possible after the shooting to capture the information sought – whether the officer was fit for duty at the time of the shooting.

Turning to the second of the three-pronged test of the "special needs" doctrine, the character and degree of the governmental intrusion, the intrusion here is quite minimal. A breathalyzer test takes 5 minutes, is performed at the scene of the shooting, and will be done in a manner that respects the officer's privacy. Campisi Decl. ¶ 61. The Court in Skinner, described the intrusion of a breathalyzer and a drug test as minimal. 489 U.S. at 624-25. Thus, the intrusion here, where only a breathalyzer is administered, is minimal as a matter of law. Prior to IO 52 the NYPD required that the officer be fit for duty at all times and prohibits the possession of a gun while impaired by alcohol. See Skinner, 489 U.S. at

621 (noting similar restrictions on railroad workers).

Under IO 52, the breathalyzer test will be used at all shootings by NYPD officers that result in injury to a person in New York City.  There is no discretion and therefore no leeway for arbitrary action or discrimination.  See Skinner, 489 U.S. at 622(one purpose of the Fourth Amendment's warrant provision is to avoid arbitrary acts by government; here the test is mandatory and circumscribed leaving little or nothing for a neutral magistrate to assess); see also Von Raab, 489 U.S. at 667.  Indeed, the standard for intoxication in IO 52 is the same as that provided by the New York's Legislature for DWI.  See N.Y. Veh. & Traffic L. § 1192; IO 52, ¶ 12, Exhibit "A."

A breathalyzer test is mandatory and routine under the narrow circumstances described in IO 52, thereby eliminating any possible stigma that might arise from that test.  In Cassidy, the Second Circuit reasoned that searching all in a category without exception relieved all those searched of any stigma that might otherwise attach to the search.  471 F.3d at 80.  NYPD officers already have notice of the intensive investigation that attends all firearms discharges and will expect the breathalyzer test in the context of this intensive investigation.  They are provided notice of the circumstances of the mandatory breathalyzer test at shootings.  Just as officers now expect random drug testing and just as they expect the intense investigation surrounding a shooting, they will expect the breathalyzer under IO 52.

The third prong of Cassidy's three-pronged test examines the government's needs and whether the search at issue meets the government's needs.  In the case at bar, if the information concerning alcohol in the officer's body at the time of the shooting is not captured immediately it will be lost.  See Skinner, 489 U.S. at 623 ("…blood and breath samples taken to measure whether these substances were in the bloodstream when a

triggering event occurred must be obtained as soon as possible.")(citation omitted).   The government need for this information is noted in IO 52 and amplified in the Campisi Declaration.  The purpose of IO 52, include:

- protecting the integrity[3] of the NYPD,

- protecting the safety of the public and NYPD officers,

- deterring alcohol intoxication by NYPD officers who are carrying firearms,

- assuring the public that one of the most important and daunting powers of the police, the power to apply deadly force when necessary, is not being abused or used by officers who are under the influence of alcohol.

Campisi Decl. ¶ 70.  The NYPD has the duty to make sure that the awesome power to use deadly force is used wisely and well.  Alcohol impaired use of a firearm is a form of corruption that the NYPD has a compelling interest in preventing and exposing.

These interests are not new and the NYPD has issued regulations other than IO 52 to help address these issues.  Prior to the promulgation of IO 52, NYPD fitness regulations warned officers not to become intoxicated.  Officers are required to safeguard their weapons and cannot carry them if they are going to be in a position where they are going to be drinking; officers may not possess guns while intoxicated.  PG-204-08, ¶ 2(e), Exhibit "F."  Regulations have been promulgated that concern solely the removal of firearms

---

[3] The dictionary defines the term "integrity" to mean "an unimpaired condition."  Websters' New Collegiate Dictionary (© 1981).  This is an especially apt phrase here because we are concerned with alcohol impaired judgment of NYPD officers who are held to the highest standards of integrity; perhaps especially the higher ranking officers represented by plaintiffs.

from NYPD officers who are intoxicated.  Id. ¶ 23; and PG 206-12, "Removal of Firearms From Intoxicated Uniformed Member of the Service," Exhibit "G."

Despite these regulations, there have 38 arrests of NYPD officers for driving while intoxicated in the period 2005 to present.  Campisi Decl. ¶ 22.[4]  Tragically, in addition to the DWI arrests, there have been 10 suicides in the period 2005 to present and of those 4 occurred where there was alcohol at the scene or a medical examiner found alcohol in the body.  Campisi Decl ¶ 22.  The NYPD has long had a Counseling Unit created to address concerns of alcohol abuse by NYPD officers.  Officers may be sent to the Counseling Unit or they may visit the unit on their own.  In either case it is because they may have an alcohol abuse concern.  See Gimblet Decl. ¶ 3.  During the years 2005- to present, about 380 NYPD personnel attended the Counseling Unit who had never been seen there before.  Id. 9.  There are approximately 35,000 NYPD officers and statistically the 380 new interviews amounts to more than 1% of the entire force.  The number of individuals counseled, the DWI arrests and the suicides prove that there are NYPD officers with drinking problems and also that officers have engaged in illegal, life threatening behavior while drinking.  Id. ¶ 23.  This proves the need of the NYPD to address this problem and ensure that it does not infect police shootings.

The NYPD need not await a tragedy to act.  See Skinner, 489 a6 607-08 ("railroads were able to detect a relatively small number of Rule G violations, owing, primarily, to their practice of relying on observation by supervisors and co-workers to

---

[4] The NYPD treats such arrests extremely seriously.  Those officers who are found to be driving while unfit for duty due to alcohol will be placed on dismissal probation which permits termination without a hearing or further process.  Id. ¶ 10.  While on dismissal probation, the officer will be tested for alcohol while both on and off duty.  Id.; IO 9-3, a part of Exhibit "C."  Those who cause injures another person while driving under the influence of alcohol will be terminated from the NYPD absent extraordinary circumstances.  Id. ¶¶ 7-9; IO 9 a part of Exhibit "C."

enforce the rule.")(citation omitted).  Moreover, the absence of a breathalyzer test means that there was less information collected concerning prior shootings by NYPD, making it harder to definitively determine that there was no alcohol involvement.  Needless to say, the NYPD hopes that the breathalyzer tests administered under IO 52 will <u>always</u> show that NYPD officers have been fit for duty during a shooting.  Further, the argument that testing will not catch many employees was made by the employees in <u>Von Raab</u>, and soundly rejected by Supreme Court.  489 U.S. at 673-74.  The government's interest in averting a tragedy and its predictable aftermath is a compelling interest.  <u>See</u> <u>Von Raab</u>, 489 U.S. at 670, 671 (describing the government's interest in maintaining unimpeachable integrity of Customs officers carrying guns as a "compelling interest.").  Thus, the government need here fully justifies the minimal intrusion into limited privacy interests of NYPD officers under <u>Cassidy</u>'s three-pronged balancing test.

Plaintiffs make much of the fact that IO 52 was promulgated in the aftermath of the November 26, 2006, shooting death of Sean Bell.   Three NYPD officers are awaiting a criminal trial in that case.  Following the shooting a number of questions were raised by the public about various aspects of NYPD undercover operations.  Campisi Decl. ¶¶ 47 and 48. A committee was formed of very high level NYPD officials to review undercover operations procedures and make recommendations for improvements.  This high level committee has so far issued 19 recommendations; breathalyzer testing was number 10 of 19.  <u>See</u> Press Release with recommendations, Exhibit "K."

Plaintiffs' argument ignores the importance of public cooperation in the achievement of the NYPD's mission.  The Supreme Court has recognized the reliance by police on the cooperation of the public.  <u>See</u> <u>Lidster</u>, 540 U.S. at 425 (and cases cited

therein).  To maintain the cooperation of the public, the police must be seen as part of and a shield for the community it serves and protects.  See Pappas v. Giuliani, 290 F.3d 143, 149-50 (2d Cir. 2002)(statements by a police officer that undermine public confidence in the police force and the confidence of police officers in one another are disruptive to the NYPD's mission and not protected by the First Amendment).  The NYPD relies on the confidence and cooperation of the public and anything that undermines that confidence endangers the NYPD's mission.  Id..  The same may be said here as was said by the Second Circuit in Pappas and has been said many times before by the Courts.

Public confidence is critical to the NYPD's mission and the integrity of shootings is integral to the public confidence.  Where there is any doubt as to the sobriety of an officer who injures a person (including him or herself) in a shooting, the confidence of the public in the NYPD can be seriously damaged.  Other NYPD officers may also be concerned that the shooting was unjustified and the officer who fired unreliable.  To forestall these damages to public and police confidence, the NYPD must demonstrate that those NYPD officers who discharge their weapons and injure a person are fit for duty when they do so. See Von Raab, 489 U.S. at 671 (the "public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force.").

The test may also deter any officer who might be tempted to go on duty or to use his or her weapon after having been drinking.  IO 52 recommends that the officer not drink during the four hours immediately preceding the officer going on duty.  This is in keeping with the requirement that officer always be fit for duty.

Here, as in so many of the special needs cases, the search has as its

"immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation." MacWade, 460 F.3d at 268(quoting Nicholas v. Goord, 430 F.3d 652, 663 (2d Cir. 2005)). This separate objective of the NYPD more than justifies the invocation of the special needs doctrine in vindicating the constitutionality of IO 52.

Plaintiffs seem to be saying that the special needs doctrine cannot support the promulgation of IO 52 because the results of the breathalyzer test may be used in a criminal proceeding. This contention must be rejected outright. First, as noted above, the possible use of the results of a breathalyzer in a criminal case is not determinative, or even indicative, of the test's constitutionality. In Skinner, the results of a breathalyzer could have been used in a criminal prosecution and yet the Supreme Court held that they were constitutional. 489 U.S. at 620-21, and n. 5. Indeed, in Skinner, the Court held that there was no proof that the drug and alcohol tests were pretexts for assisting criminal prosecutions and resolved to leave such issues as pretext for another day. Id. Similarly, in MacWade and Cassidy, the Second Circuit approved random searches designed to deter terrorism even though the results of the search could have been used in a criminal prosecution.

Further, IO 52 applies to an accidental shooting with no real risk of criminal prosecution. Campisi Decl. ¶ 10. Indeed, in the month since IO 52 promulgation on September 30, 2007, there has been an accidental shooting by an NYPD officer and the officer whose firearm discharged was injured. Id. ¶ 58. A breathalyzer test was administered under IO 52 to that officer. Id. This is proof positive that the purpose of IO 52 is not simply for the purpose of gathering evidence for a criminal investigation but is, rather, to maintain the integrity of police shootings in the City, ensure the public and the NYPD's officers that the authority to use deadly force is not being abused by officers involved in a shooting.

The search in the instant case is closely analogous to the search found reasonable and constitutional in Skinner. There as here the employees were highly regulated public safety personnel. However, there is no evidence in Skinner that the railroad employees were subject to random drug testing as are the NYPD officers. The privacy interests of NYPD officers are, if anything, even more limited than those of the railway employees of Skinner. Here the employees are NYPD officers who are employees of the government and are invested with power and discretion by the government, while in Skinner the employees were private employees subject to a government impelled search.

The testing in Skinner was triggered by an accident and here the testing is triggered by certain firearms discharges. In Skinner there was a history of alcohol abuse. Here there is a history of alcohol abuse in the NYPD, even though there is no history of alcohol involvement in shootings other than suicides. In Skinner, the needs justifying the testing, which was not limited to a breathalyzer, was the integrity of the railroad and the confidence of the public in the railways. Here the need justifying the search, which is restricted to a breathalyzer, is the integrity of shootings by the NYPD and confidence in the City's police force. In both Skinner and the instant case testing program was expected to deter alcohol use on duty or immediately prior to duty. In both Skinner and the instant case, the information sought, whether there was alcohol use at the time of the incident, would be lost absent an immediate breathalyzer test and the incident triggering the test was narrowly defined in the regulation. That it is the NYPD here rather than railroad as in Skinner should not make a difference of constitutional import. Cf. O'Connor v. Ortega, 480 U.S. 709 (1987) (in a Foiurt Amendment case distinguishing between public employer as enforcer of law and public employer as an employer). Thus, here as in Skinner the breathalyzer constitutes a

- 18 -

special needs search which is reasonable under the Fourth Amendment and constitutional. IO 52 is "reasonable" as that term is used by the Fourth Amendment and the breathalyzer tests at issue constitutional.

## POINT II

### THE DUE PROCESS CLAUSE CLAIMS MUST BE DISMISSED.

#### A.     Substantive Due Process

Alleged "improper actions taken by employers [do not] violate an employee's substantive due process rights simply because that employer is a government official." McClary v. O'Hare, 786 F.2d 83, 89 (2d Cir. 1986).  The Supreme Court and the Second Circuit have held that substantive due process is not a "catch-all" duplicative of the specific guarantees of the Bill of Rights.  See Albright v. Oliver, 510 U.S. 266, 273 (1994); Velez v. Levy, 401 F.3d 75, 94 (2d. Cir. 2005)("… we have held that where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a §1983 suit cannot make reference to the broad notion of substantive due process.").  In Albright the Supreme Court refused to create a substantive due process right duplicative of the specific guarantees of the Fourth Amendment because the "particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'"  510 U.S. at 273 (plurality) (citation omitted).  The Second Circuit echoed that holding earlier this year in concluding that

> Thus, since the *Fourth Amendment* provides a more "explicit textual source of constitutional protection," in light of *Graham*, the *Fourth Amendment*, rather than substantive due process, should serve as "the guide for analyzing these claims."

Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007)(quoting Graham v. Conner, 490

U.S. 386, 395 [1989]).  Thus, the substantive due process clause is not, as plaintiffs here would have it, some sort of supplement to the specific guarantees of the Bill of Rights, providing overlapping or perhaps more extensive protections than those specific guarantees.

In the instant case, as shown in Point I, above, IO 52's mandate of a breathalyzer for NYPD officers who discharge their firearms injuring a person is entirely consistent with the Fourth Amendment.  Under the teaching of Albright, repeated by the Circuit in Velez, plaintiffs do not have a substantive due process claim which does not exist under the Fourth Amendment.  Thus, the substantive due process claims must be dismissed.

**B.** **Procedural Due Process**

Plaintiffs' procedural due process claim is somewhat opaque.  Plaintiffs claim that it is based on a property interest in their employment and in a liberty interest in reputation.  The taking of a breathalyzer, standing alone does not implicate either of those interests and, thus, the procedural due process claim must be dismissed. [5]

Turning to the merits, plaintiffs seem to reason that a Captain may be subject to IO 52, may fail the breathalyzer, and may then be immediately suspended without process.  Pl. Memo. at 12.  Plaintiff attempts to weave this into some sort of claim concerning the breathalyzer by pointing out, correctly, that Captains have a constitutionally cognizable property interest in retaining their job.  Plaintiffs' then contend, this time incorrectly, that there must be process before a government employee can be suspended.  This chain of

---

[5] Indeed, plaintiffs lack standing to interpose a procedural due process claim in the absence of any showing that the chain of speculation in likely to occur.  See Lewis v. Continental Bank, 494 U.S. 472, 477 (1990)(requiring actual injury); Los Angeles v. Lyon, 461 U.S. 95 (1983)(plaintiff can only seek to enjoin a police practice if there is a real likelihood that the practice will be applied to that plaintiff); Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004).  An individual cannot assert the Fourth Amendment rights of another person.  See, e.g., Minnesota v. Carter, 525 U.S. 83 (1998)(transient guest in home cannot assert Fourth Amendment).

supposition and speculation, without any concrete injury to date, cannot suffice to state either standing or a procedural due process claim.  Plaintiffs do not cite a Captain to which IO 52 has been applied, much less one who has been found to be under the influence of alcohol while involved in a shooting which injures a person.  Thus, this claim is premature and should not be entertained by the Court.

In Gilbert v. Homar, the Supreme Court held that there need not be any particular process prior to the suspension of a government employee where the employee is entitled to a prompt post-suspension hearing on the charges.  520 U.S. 924 (1997).  The Second Circuit has noted that due process cannot be separated from its purpose "Pre-deprivation process 'need not be elaborate.' Its primary function is to serve as an "initial check against mistaken decisions . . . ."  O'Connor v. Pierson, 426 F.3d 187 (2d Cir. 2005) (citations omitted).  Here, an officer who has a positive breathalyzer will be tested a second time on a more sensitive machine, an Intoxilyzer.  Only then will the NYPD consider whether there will be further investigation, whether disciplinary charges are to be lodged and whether the Captain is to be suspended at all.  If the Captain is suspended then that Captain will be afforded an array of post-suspension process which more than amply fulfills the Due Process Clause's requirements.  Plaintiffs do not contend otherwise.  As in Gilbert, and O'Connor, the pre-deprivation process provided more than amply protects plaintiffs' property interest in employment.

Plaintiff's citation to Kennedy v. City of New York, is entirely unavailing.  1995 U.S. Dist. LEXIS 7437 (S.D.N.Y. 1995); Pl. Memo at 12-13.  First, the suspension in Kennedy was indefinite while any suspension here would be limited by statute to 30 days.  See N.Y. Civil Service L. § 75(3-a).  Second, Kennedy was decided by the District Court

without the benefit of the Supreme Court's decision in <u>Gilbert</u> which held that the constitution does not mandate that suspensions be preceded by elaborate process. Therefore, the Complaint's procedural due process claim must be dismissed.

## POINT III

## THE PRELIMINARY INJUNCTION MUST BE DENIED.

Assuming, <u>arguendo</u>, that the Court finds that the Compliant need not be dismissed, plaintiff's motion for a preliminary injunction must be denied. The minimum standard for preliminary injunctive relief is well-settled. The Second Circuit requires a clear showing that: (1) plaintiffs will suffer irreparable harm in the absence of the injunction, and (2) there is either: (a) a likelihood of success on the merits; or (b) sufficiently serious questions going to the merits making them a fair ground for litigation, and the balance of hardships tips decidedly in plaintiffs' favor. <u>See Jolly v. Coughlin</u>, 76 F.3d 468, 473 (2d Cir. 1996). However, when a party seeks to enjoin government action, she may not rely on the less rigorous "serious questions" alternative of the second prong, but instead must demonstrate a likelihood of success on the merits. <u>See Time Warner Cable of New York City v. Bloomberg</u>, 118 F.3d 917, 923 (2d Cir. 1997)(noting that the heightened standard applies "where the injunction stays governmental action taken in the public interest pursuant to a statutory . . . scheme") (internal quotations and citation omitted). Preliminary injunctive relief is an extraordinary remedy which is always within the Court's discretion even where the minimum standard is met. Courts should be reluctant to utilize this extraordinary remedy and it should be granted only in rare circumstances. <u>Medical Society v. Toia</u>, 560 F.2d 535, 538 (2d Cir. 1977).

Generally, the purpose of a preliminary injunction is to maintain the *status*

*quo* pending the ultimate outcome of the underlying action.  Arthur Guiness & Sons, PLC v. Sterling Publishing Co., 732 F.2d 1095, 1099 (2d Cir. 1984).  Where, as here, the preliminary relief sought is identical to the ultimate relief sought, a greater showing is necessary.  Plaintiffs must demonstrate either "'a clear showing that [they are] entitled to the relief requested,' . . . or . . . 'extreme or very serious damage will result' from a denial of relief[.]"  Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985) (citations omitted).  The instant complaint must be dismissed, either on the motion to dismiss or on summary judgment, and, for the same reasons, the preliminary injunction motion must be denied.

In the instant case, as has been shown above, the Complaint does not state a claim on which relief can be granted.  IO 52 falls squarely within the special needs doctrine of the Fourth Amendment and is constitutional.

In the balance against these needs are the privacy interests of NYPD officers.  Those officers are already subject to random drug tests and have very limited privacy interests.  NYPD are subject to a variety of regulations that are directed at their fitness for duty.  Moreover, if the breathalyzer test is not performed soon after the shooting its utility will rapidly decrease.  This was recognized by the Supreme Court in Skinner.  The circumstances under which the test will be administered is narrowly limited to serve the needs described above.  The officer must be involved in a shooting, off the shooting range, in New York City and the shooting must have resulted in injury or death to a person.  This narrow focus guarantees that there will not be arbitrary or discriminatory action.  The use of the test cut-off prescribed by the Vehicle and Traffic Law also removes subjectivity to the testing under IO 52.  The test itself is performed under conditions that maximize the officer's privacy to the extent possible.  The requirement of a breathalyzer test in all cases that meet

this narrow interest removes the stigma that might otherwise attach to the test.  Indeed, there would be more stigma possible prior to IO 52 if a superior officer ordered a breathalyzer test for it might be thought that the officer was suspected of being intoxicated because the test was administered.  The intrusion on privacy from a breathalyzer test are minimal and the duration for the test short, about 5 minutes for the test.  IO 52 represents a minimal incremental intrusion on the already extremely limited privacy rights of NYPD officers.  In the balance, IO 52 meets the test of reasonableness under the Fourth Amendment.  Thus, there is no likelihood of success on the merits of the Complaint in this case and plaintiffs' motion for a preliminary injunction must be denied.

    While the balance of hardships prong is not applicable to the instant case, if the Court considers the balance of hardships the preliminary injunction should be denied. Plaintiffs similarly fail to demonstrate that a balance of hardships tips decidedly in their favor.  To show that the balance of hardships tips in their favor, plaintiffs must show that " . . . the harm [they] would suffer absent the relief sought is substantially greater than the harm [their] opponent would suffer if relief was granted."  Clemente Global Growth Fund, Inc. v. Pickens, 705 F. Supp. 958, 971 (S.D.N.Y. 1989) (citing Buffalo Forge Co. v. Ampco Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981).  The minimal intrusion of a breathalyzer administered to NYPD officers in the course of an already thorough and intensive investigation is barely a hardship.  On the other hand, IO 52 is important to the integrity of NYPD shootings, the confidence of the public and fellow officers, and will deter alcohol use impairing the NYPD officers.  The balance here tips decidedly in the government's favor and thus the injunction must be denied.

## CONCLUSION

**WHEREFORE**, defendants respectfully request that plaintiffs' motion for a preliminary injunction be denied, that defendants' motion to dismiss be granted, or in the alternative, that defendants' motion for summary judgment be granted, that the complaint be dismissed in all respects, that the request for relief be denied in its entirety, that judgment be entered for defendants, and that defendants be granted costs, fees, and disbursements, together with such other and further relief as the Court deems just and proper.

Dated:      New York, New York
             December 7, 2007

                                  **MICHAEL A. CARDOZO**
                                  Corporation Counsel of the
                                    City of New York
                                  Attorney for Defendants
                                  100 Church Street, Room 2-187
                                  New York, N.Y. 10007-2601
                                  (212) 788-0952

By:   **ECF**             /s/
                                  Alan M. Schlesinger
                                  Assistant Corporation Counsel